[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

RECEIVED

FEB 22 2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

ERIC CLEMENTS )
)
)
)
)
Plaintiff(s), )
)
v. )
)
ZIP-PAK )
)
)
)
)
Defendant(s). )

Case Number: _____

1:23-cv-01066
Judge Sharon Johnson Coleman
Magistrate Gabriel A. Fuentes
Random Assignment

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is ERIC CLEMENTS _____ of the

county of LaSalle _____ in the state of ILLINOIS _____.

3. The defendant is ITW-ZIP-PaK _____, whose

street address is 1510 WaReHouse DR, _____,

(city) OTTawa ____ (county) LaSalle (state) IL (ZIP) 61350

(Defendant's telephone number) (815) – 431-0300 _____

4. The plaintiff sought employment or was employed by the defendant at (street address)

1510 WaReHouse DR, _____ (city) OTTawa _____

(county) LaSalle (state) IL ___ (ZIP code) 61350

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5. The plaintiff [*check one box*]

(a) ☑ was denied employment by the defendant.

(b) ☐ was hired and is still employed by the defendant.

(c) ☐ was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about, (month)__6__, (day)__23__, (year)__2022__.

7.1 *(Choose paragraph 7.1 or 7.2, do not complete both.)*

(a) The defendant is not a federal governmental agency, and the plaintiff [*check one box*] ☑*has* ☐*has not* filed a charge or charges against the defendant asserting the acts of discrimination indicated in this complaint with any of the following government agencies:

(i) ☑ the United States Equal Employment Opportunity Commission, on or about (month)__07____(day)_01___(year)_22___.

(ii) ☐ the Illinois Department of Human Rights, on or about

(month)_____(day)_____(year)_____.

(b) If charges *were* filed with an agency indicated above, a copy of the charge is attached. ☑ Yes, ☐ No, **but plaintiff will file a copy of the charge within 14 days**.

It is the policy of both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights to cross-file with the other agency all charges received. The plaintiff has no reason to believe that this policy was not followed in this case.

7.2 The defendant is a federal governmental agency, and

(a) the plaintiff previously filed a Complaint of Employment Discrimination with the

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 04/05/2018

2

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

defendant asserting the acts of discrimination indicated in this court complaint.

☑ Yes (month)___*06*___ (day)_*23*_ (year)_*2022*_

☐ No, did not file Complaint of Employment Discrimination

(b)    The plaintiff received a Final Agency Decision on (month)_*11-28-2022*_ (day)_*28*_ (year)_*2022*_.

(c)    Attached is a copy of the

(i) Complaint of Employment Discrimination,

☑ Yes    ☐ No, but a copy will be filed within 14 days.

(ii) Final Agency Decision

☑ Yes    ☐ N0, but a copy will be filed within 14 days.

8.    *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(a) ☐    the United States Equal Employment Opportunity Commission has not issued a *Notice of Right to Sue.*

(b) ☐ the United States Equal Employment Opportunity Commission has issued a *Notice of Right to Sue*, which was received by the plaintiff on (month)_*11*_ (day)_*28*_ (year)_*2022*_ a copy of which *Notice* is attached to this complaint.

9.    The defendant discriminated against the plaintiff because of the plaintiff's [*check only those that apply*]:

(a) ☑ Age (Age Discrimination Employment Act).

(b) ☐ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 04/05/2018

2

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(c) ☑ Disability (Americans with Disabilities Act or Rehabilitation Act)

(d) ☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e) ☐ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f) ☐ Religion (Title VII of the Civil Rights Act of 1964)

(g) ☑ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the ADA by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791; and for the ADEA, 29 U.S.C. § 626(c).

12. The defendant [*check only those that apply*]
(a) ☑ failed to hire the plaintiff.

(b) ☐ terminated the plaintiff's employment.

(c) ☑ failed to promote the plaintiff.

(d) ☐ failed to reasonably accommodate the plaintiff's religion.

(e) ☑ failed to reasonably accommodate the plaintiff's disabilities.

(f) ☐ failed to stop harassment;

(g) ☑ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h) ☑ other (specify): Failed To investigate my sexual Harassment claim against employee NoAH BLaKLeY

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 04/05/2018

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

THe employeR Failed To offeR Training to me But offeRed iT to youngeR people Like NOAH BlakLey WHo is 22 and insTead denied me employmenT

13. The facts supporting the plaintiff's claim of discrimination are as follows:

The employeR admiTTs To asKing me aBouT employmenT Gaps, which aRe ~~employment~~ sTRicTly RelaTed To disaBiliTies. The conFlicT I has wiTh a co. woRKeR was caused By my hypoglycemia/diaBeTes, using my disaBiliTies againsT me is discRiminaTion, using incidenTs caused By my disaBiliTies is discRiminaTion

14. **[AGE DISCRIMINATION ONLY]** Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15. The plaintiff demands that the case be tried by a jury. ☐ Yes ☑ No

16. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ☑ Direct the defendant to hire the plaintiff.

(b) ☐ Direct the defendant to re-employ the plaintiff.

(c) ☐ Direct the defendant to promote the plaintiff.

(d) ☐ Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ☑ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ☑ Direct the defendant to (specify): pRovide back pay daTing To July FIRsT 2022 when I was denied employmenT equal To 20 dollaRs a

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 04/05/2018

2

_HouR 12 HOUR SHIFTS 21 day a monTH_
_equal TO 5,040 dollaR a monTH_

(g) ☑ If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☑ Grant such other relief as the Court may find appropriate.

_Eric Clements_
(Plaintiff's signature)

_ERic clemenTS_
(Plaintiff's name)

_1001 maRcy ST_
(Plaintiff's street address)

(City) _OTTawa_ (State) _IL_ (ZIP) _61350_

(Plaintiff's telephone number) _(815)_ – _993-0277_

Date: _2-13-2023_

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 04/05/2018

2



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Chicago District Office
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

# DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 11/28/2022

**To:** Mr. Eric Clements
1001 Marcy St
OTTAWA, IL 61350
Charge No: 440-2022-06814

EEOC Representative and email:     Daniel Gajda
investigator
daniel.gajda@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2022-06814.

On behalf of the Commission,

Digitally Signed By:Julianne Bowman
11/28/2022

Julianne Bowman
District Director

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Chicago District Office
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## NOTICE OF CHARGE OF DISCRIMINATION

(This Notice replaces EEOC FORM 131)

08/07/2022

**To:** Zip pak
1510

WOODLAND ADDITION, IL 61350

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Eric Clements under: The Americans With Disabilities Act of 1990 (ADA), The Age Discrimination in Employment Act of 1967 (ADEA), Title VII of the Civil Rights Act of 1964 (Title VII). The circumstances of the alleged discrimination are based on Age, Disability, Sex, and involve issues of Hiring, Harassment that are alleged to have occurred on or about 06/01/2022.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, the EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access the EEOC's secured online system at https://arc.eeoc.gov/rsp/login.jsf
2. Enter this EEOC Charge No.: 440-2022-06814
3. Enter this password: oi69iEMd

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding it, you may send an email to CHICAGOEEOC@EEOC.GOV.



# EEOC (Inquiry) Number: 440-2022-06814

## Inquiry Information

### INQUIRY OFFICE

**Receiving:** Chicago District Office

**Accountable:** Chicago District Office

### POTENTIAL CHARGING PARTY

**Name:** Mr. Eric Clements

**Address:** 1001 Marcy St
OTTAWA, IL 61350

**Year of Birth:** 1981

**Email Address:** eclements022@gmail.com

**Phone Number:** 815-993-0277

### POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

**Gender:** M

**Disabled?** I have a disability

**Are you Hispanic or Latino?** not hispanic or latino

**Ethnicity:** White,

**National Origin:** American(U.S.)

### RESPONDENT/Employer

**Organization Name:** Zip pak

**Type of Employer:** Business or non-profit organization that I applied to, work for, or worked for

**Number of Employees:** An uncertain number of employees

**Address:** 1510
WOODLAND ADDITION, IL 61350

**County:** Lasalle

**Phone Number:**

### LOCATION OF POTENTIAL CHARGING PARTY'S EMPLOYMENT

**Address:**

County:

## RESPONDENT CONTACT

**Name:** Zip pak

**Email Address:** Lindi.parcher@zippak.com

**Phone Number:**

**Title:**

## REASON(S) FOR CLAIM

**Date of Incident (Approximate):** 06/13/2022

**Reason for Complaint:** Age - I am 40 years of age or older, Sex (including pregnancy, sexual orientation and gender identity), Disability

**Pay Disparity:** No

**Location of Incident:** Illinois

**Submission (initial inquiry) Date** 06/29/2022

**Claim previously filed as charge with EEOC?** No

**Approximate Date of Filing:**

**Charge Number:** 440-2022-06814

**Claim previously filed as complaint with another Agency?** No

**Agency Name:**

**Approximate Date of Filing:**

**Nature of Complaint:**

## Adverse Action(s)

I had a phone interview with the HR staff at first around June 13th 2022 then around June 18 I was given a second interview this time in person with the hiring manager and was showed around the job site couple days later I was called again by HR with further questions basically another interview the company is looking for experience according to the job post and I have experience far more experience than recent hires by the same company the company has hired people recently with no experience i am disabled and company knows I am over 40 and company is known for hiring people under 40 only and I am lgbtq which I know of at least one current employee at the company who has recently turned people against me outside of work so I wouldn't be surprised if the same individual is trying to convince the company to not hire me this company has been known for not hiring people in my family with my same last name as other relatives of mine with the same last name clements and they was over 40

## APPOINTMENT

**Appointment Date and time:** 07/28/2022 10:30:00 CST

**Interview Type:** Phone

**APPROXIMATE DEADLINE FOR FILING A CHARGE:** 04/10/2023

## Supplemental Information

### What Reason(s) were you given for the action taken against you?

They chose to move on with a different candidate, their team was impressed by my skills and accomplishments. They think i would be a good fit for future openings.

### Was anyone in a similar situation treated the same, better, or worse than you?

Yes Jeremy blakley and or Luke blakley had a interview and was hired over me he is under 40 not disabled and hates LGBQT people and he has been in Facebook jail on several of his different accounts for gay bashing Jeremy blakley hates me and is a friend/family luke blakley is the brother of noah blakley and Luke blakley believes everything his brother says lie or not so he hates me for the accusations Noah blakley made and our work history and experience is similar. Jeremy blakley can drive a vehicle i can't do to my disabilities. Jeremy blakley was referred by Noah blakley both of whom hate me because Noah blakley claims I attempted to offer him cash for sexual favors and Jeremy and Noah blakley hate gay people as they do me even though I don't swing like that Noah blakley only made those false accusations about me because I wouldn't let Noah blakley commit financial exploitation of the elderly and disabled that being me by trying to get me to go to the medical dispensary for him so Noah blakley made up the lie and recruited people who he has turned against me who hates LGBQ people and believed Noah blakley lie about me offering cash for sexual favors. Having people who are homophobic work where LGBQ people work makes a hostile unsafe work environment

### Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this person will provide.

I was just told the job was filled today July 1st 2022 a current employee named Noah blakley that don't like me who accused me of a false crime solicitation to pay Noah blakley cash if I can give Noah blakley a BJ, this is retaliation and lie by Noah blakley against me for not going to the dispensary for Noah blakley like Noah blakley asked me to do before making the false accusations about solicitation text messages prove it if I can recover those text. Zip pak in Ottawa Illinois don't have LGBQ people that work there zip pak in Ottawa Illinois don't hire people over 40 like me and my uncle Danny clements to machine operator's both my uncle Danny clements and myself denied employment by zip pak do in part to our ages the company don't hire disabled people for machine operator like myself, zip pak claims to want experience but won't hire my uncle or me both who are more than experienced but the company has recently hired people with no experience and under 40 and not disabled and not LGBQ clearly this is discrimination against so many protected classes that i am part of and I have evidence from people that have heard the false accusations that Noah blakley has made against me of solicitation. Zip pak gave me 3 interviews before deciding not to hire me which makes me believe they had interest until Noah blakley falsely accused me of solicitation. There is discrimination within the hiring process of zip pak in Ottawa Illinois the lack of hiring people over 40 as machine operator's and or people who are LGBQ and or disabled and all categories are all protected classes. Zip pak recently hired Noah blakley and Jeremy blakley over me to a machine operator which zip pak job post claims to look for experience and Noah blakley and Jeremy blakley had no machine operator's experience before being hired at zip pak yet I am experienced machine operator and zip pak claims to be looking for experience yet zip pak wouldn't hire me do to being over 40 being disabled and accused of solicitation by Noah blakley who is using false accusations he (Noah blakley) has made up about me turning society against me and now using false accusations to turn zip pak against hiring me and instead zip pak continues to hire people Noah blakley referred showing discriminatory and favoritism as Noah blakley continues to try to get people hired who he has turned against me like Jeremy blakley and Luke blakley who i believe both was recently referred by Noah blakley and hired by zip pak over me leading to nepotism giving unqualified favoritism to family and friends, I've been out of work since 2020 do to ada disability reasons which are protected so using that as a reason to not hire me is no legal excuse. Allowing employers to pick anyone instead of picking the first applicant that qualifies allows the employer to perform indirect discrimination against those of us in a protected class and indirect discrimination is described as a policy that is meant to be fair for everyone but are less fair to those of a certain protected class, characteristics under the equality Act of 2010. Allowing employers to pick whatever applicant they wish to hire instead of hiring the first qualified candidate allows the employer to discriminate this is a policy that applies to everyone but it puts people over 40 and disabled people and LGBQ people and people of color at a disadvantage of being considered for employment this is a blanket policy a violation and it is indirect discrimination as the policy is a disadvantage to those of us of a protected class Allowing employers to overlook disabled over 40 LGBT experienced applicant but that same employer hires applicant's who are not part of a protected class just shows this

policy is a disadvantage to those of us of a protected class like myself. I have been out of work since 2020 do to severe medical conditions of my own and my 90 year old grandmother that I live with and take care of and have done the past 12 years my work history has been unsteady do to severe illnesses/medical conditions such as epilepsy and Addison disease and my legally blind 90 year old grandmother, and the hiring manager was very concerned about why I had long stretches of missed work as the hiring manager kept repeatedly asking me about why I had long periods of unemployment therefore I believe this was possibly the reason or part of the reason why I was discriminated against and not hired and according to the ADA those are both protected reasons for being unemployed for long periods of time and therefore it is discrimination to use the time I've been unemployed as reason or part of the reason for not hiring/discriminating against me. I am also protected through the individual disability educational Act or (IDEA) or the rehabilitation Act of 1973. I am also protected under executive order 11246 sexual orientation and or sexual preferences hiring discrimination, which i believe to be a victim of do to Noah blakley being a employee at zip pak and Noah blakley spreading false accusations accusing me of solicitation, Noah blakley has told police that I asked him to pay him for sexual favors like he has told everyone turning everyone against me as I have stated I even have messages from people stating that they over heard the rumors about me started by Noah blakley a zip pak employee who is under the age 40 and had no experience and was hired by zip pak but zip pak wouldn't hire me age 41 accused of being LGBQ disabled. Zip pak is known for not hiring people over 40 for certain positions like machine operator like zip pak has done with my uncle Danny clements and myself denying us both employment while having no problem hiring unexperienced people under the age 40 and zip pak has not got one LGBQ person hired in Ottawa Illinois but zip pak has people who are employed who hate LGBQ people and who know and hate me for being falsely accused of solicitation of Noah blakley/LGBQ which could explain why they discriminate against hiring me. I am disabled and zip pak knows this and zip pak don't hire people who are disabled or LGBQ or people who are 40 or older as machine operator's if any positions at all making me believe I was not hired in part do to being disabled even though I qualify for the position and have experience. Zip pak is in violation of the 80% 4/5 law. Zip pak asks if I am disabled in the interview and on the job application. Zip pak is in violation of 503 of the rehabilitation Act of 1973, as zip pak don't hire people with disabilities like myself. I was also not hired do to no driver's which is a violation because me having no driver's license is do to my disabilities and driving is not part of the job, I am protected under the ADA Since I have other transportation. During the job interview I was asked if I had a criminal record which violates Illinois senate Bill 1480 and discriminates against me do to my record according to the IDHR. Griggs v Duke power company. indirect discrimination adverse impact against protected classes i applied again at zip pak. Zip pak is in violation of the affirmative action and people with disabilities. Zip pak now dont consider my applications i recently filed supporting my belief that zip pak is discriminating against me and retaliating against me for filing a complaint to the EEOC against zip pak and retaliating against me on behalf of current employees noah blakley and Jeremy blakley. Zip pak is in violation of affirmative action leading to adverse impact. Zip pak has excluded me from being hired as a machine operator do to being disabled over 40 and accused solicitation of Noah blakley/LGBQ, history shows zip pak don't hire people of protected classes with experience as machine operator's but they hire under 40 unexperienced non protected class people. Zip pak in Ottawa Illinois don't hire people 40 and over as machine operator's putting people 40 and over at a disadvantage. There is more to say but no more room.

## Please tell us any other information about your experience?

I was given 3 interviews and a walk through the company has a history of not hiring people over 40 as they have refused to hire both my uncle Danny clements who recently applied and is experienced and over 40 just like I am but the company discriminates against people over 40 and people who are disabled like me which is why no disabled people work there and people they discriminate against people who are lgbtq like me which is why no lgbtq people work there. My uncle and me have more experience than the people that got hired yet the job post specifically states it is seeking experience but not preferred the company has no problem hiring young unexperienced people but they have a problem hiring over 40 that is experienced like my uncle Danny clements and myself Eric clements history records don't lie

· EXHIBIT #1 is PART OF THE ZIP-PAK JOB application WHERE ZIP-PAK asked me IF I Have a disaBiLITY, and I answeRed yes, PROving ZIP-PaK did Have KnowLedge oF me Being disaBled PROving ZIP-Pak To Be Lying.

EXHIBIT #2 conFiRms my disaBiLiTies, consisTing ePilePsy, IRRiTable bowel syndRome, CHRonic gasTRiTis, GERD, ESOPHagiTIS, DuPuyTRens conTRacTuRe, adRenal InsuFFiciency, CHRonic FaTigue, HyPoglycemia, PSYCHOSIS, anTisocial PeRsonaLiTy disoRdeR, POST TRaumaTIC sTRess disoRdeR, anxieTy disoRdeR, InTeRmiTTenT exPlosive disoRdeR, BiPolaR, ADHD.

EXHIBIT #3 is my Resume THaT was suBmiTTed aLong with my JoB aPPLicaTion and THe Resume STaTes/conFiRms ThaT I was a macHine oPeRaToR FRom 2010 To 2011 PRoving I do Have macHine oPeRaToR exPeRience, WHICH is THe PosiTion I aPPLied FoR aT ZIP-Pak PRoving I am quaLiFied FoR THe PosiTion, again PROving ZIP-Pak To Be Lying cLaiming I am noT exPeRienced

9:36 👁 🌑 M •    📶 LTE .ıll ⚡

may result in my dismissal at any time regardless of
when the false answer or omissions are discovered.

◉ Yes
○ No

Race/Ethnicity: __definitions__ *

White    ⌄

Gender *

Male    ⌄

Are you a protected veteran? (__definitions__) *

○ Yes
◉ No
○ Prefer not to answer

==Do you have (or have a history/record of having) a
disability? (definitions) *==

◉ ==Yes, I Have A Disability, Or Have A History/Record Of
Having A Disability==

○ No, I Don't Have A Disability, Or A History/Record Of
Having A Disability

○ I Don't Wish To Answer

Your Name *

Eric Clements

Today's Date *

9/2/2022

Please review the ITW __Privacy Policy__.

|||      ○      ‹

_exHiBiT #2_



## OSF HEALTHCARE
### Illinois Neurological Institute

*EXHIBIT #2* (handwritten)

*SePT 12 2:30PM* (handwritten)

Eric S Clements
1001 Marcy St
Ottawa IL 61350-4325

January 17, 2022

To whom it may concern,

Eric S Clements is a patient of OSF HealthCare Illinois Neurological Institute. The letter is written per his request. Eric carries a diagnosis of seizure disorder/epilepsy.

Sincerely,

Christel Kappes, PA-C
OSF HealthCare Illinois Neurological Institute - Neurology - Peoria Penn Ave
200 E PENNSYLVANIA AVE
PEORIA IL 61603-3084
Phone: 309-624-4000
Fax: 309-624-4010

*case# 3782824* (handwritten)

Julie M. Flanagan, ACNS, BC · Jenny Gaworski, FNP, BC · Stephanie Mickley, FNP-C

**530 PARK AVE EAST, STE 207 · PRINCETON, IL 61356· PH: 815-875-8666**
**1310 MAPLE DRIVE · PERU, IL 61354 · PH: 815-223-1666**
**1304 GEMINI CIRCLE, STE 1 · OTTAWA, IL 61350 · PH: 815-433-9666**

**Eric S. Clements**
09/10/2021 01:30 PM
Location: Ottawa office
Patient #: 50159
DOB: 02/25/1981
Marital status: Single / Language: English / Race: White / Ethnicity: Not Hispanic or Latino
Gender: Male
REFERRING PHYSICIAN: Robert B. Maguire

**History of Present Illness** *(Jenny Gaworski, FNP BC 09/10/2021 02:19 PM)*
The patient is a 40 year old male who presents for a Recheck of Gastroesophageal reflux disease. Note for "Gastroesophageal disease": PT IS NOTED TO HAVE GERD, ESOPHAGITIS, GASTRITIS.

PT TAKES CARAFATE AS NEEDED.

PT ALSO TAKES PANTOPRAZOLE 40 MG DAILY.

GERD DIET RECOMMENDED.

Additional reasons for visit:

Recheck of Irritable bowel syndrome is described as the following:
Note for "Irritable bowel syndrome": PT HAS KNOWN IBS, WHICH IS CONTROLLED THROUGH DIET AND MEDS.

PT EATS HIGH FIBER DIET.

PT HAVING NO BLOOD BMS OR WEIGHT LOSS AT THIS TIME.

PT HAS HAD US AND HIDA, CT, AND SCOPES IN THE PAST.

STOOL STUDIES AND BLOOD WORK.

PT IS HAVING CF BLOOD TEST, HOWEVER RESULTS ARE NOT BACK YET.

PT WEIGHT IS UP 9 POUNDS FROM PREVIOUS APT.

**Allergies** *(Breanna Zukowski, CNA- 09/10/2021 01:14 PM)*
NAPROXEN
traMADol HCl *ANALGESICS - OPIOID* [Drug allergy]

**Past Medical History** *(Jenny Gaworski, FNP BC; 09/10/2021 02:17 PM)*
Anxiety and depression (F41.9)
Dupuytren's contracture (M72.0)
Epilepsy (G40.909)
IBS (irritable bowel syndrome) (K58.9)
PTSD (post-traumatic stress disorder) (F43.10)
Adrenal Insufficiency
Esophagitis
Chronic Gastritis
Irritable bowel syndrome

Case: 1:23-cv-01066 Document #: 1 Filed: 02/22/23 Page 19 of 85 PageID #:19

Tests ordered for a future date

## Labs

- CMP on 05/17/2021 (for: Others)
- T4 FREE on 05/17/2021 (for: Others)
- TSH on 05/17/2021 (for: Others)

## Imaging Studies and Other Tests

- CT ABDOMEN W/WO IV on 02/17/2021 (for: Others)

## Other Medical Conditions (Problem List)

| Code | Condition | | Modified |
|---|---|---|---|
| • R53.82 | Chronic fatigue | | |
| | Onset Date: | | Modified On: 02/17/2021 |
| • E16.2 | Hypoglycemia | | |
| | Onset Date: | | Modified On: 02/17/2021 |
| • R63.4 | Weight loss | | |
| | Onset Date: | | Modified On: 02/17/2021 |
| • Z79.899 | Medical marijuana use | | |
| | Onset Date: | | Modified On: 02/17/2021 |
| • Z87.898 | History of idiopathic seizure | | |
| | Onset Date: | | Modified On: 02/17/2021 |
| • E27.40 | Adrenal insufficiency | | |
| | Onset Date: | | Modified On: 02/17/2021 |

## Preventive Medicine

- Patient Education:

# INTEGRATED ASSESSMENT

CLEMENTS — ERIC STEVEN
007-032635  72  1E
ADOL-2  72
M JEFF S N 572  3
3-30-98  W  2-25-81
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

DIAGNOSIS

Axis I: Clinical Disorders and Other Conditions That May Be a Focus of Clinical Attention

Diagnostic Code

298.9  Psychosis NOS

Axis II: Personality Disorders and Mental Retardation

Diagnostic Code

301.7  anti-social personality

Axis III: General Medical Conditions

V70.5  Healthy ♂

Axis IV: Psychosocial and Environmental Problems
Check:

☒ Problems with primary support group  Specify: Difficulties c̄ family
☒ Problems related to the social environment  Specify: Difficulty relating to peers
☐ Educational Problems  Specify:
☐ Occupational Problems  Specify:
☐ Housing problems  Specify:
☐ Economic problems  Specify:
☐ Problems with access to health care services  Specify:
☒ Problems related to interaction with the legal system/crime  Specify: Has charges
☐ Other  Specify:

Axis V: Global Assessment of Functioning Scale  Score: 35  Timeframe

Attending Psychologist's Signature  Alan DePeder, M.D.  Date: 3-31-98

=====(End of Attending's Assessment See the Initial Plan of Patient Care)=====

Name:
Type: Initial Psychiatric Visit (Active Diagnoses)

Case# 17862

Page 12 of 14
Date: 05/05/2022

## North Central Behavioral Health Systems, Inc.

### DIAGNOSIS REVIEW - DSM 5

**Disorders and Conditions**

| ID | Description | Priority | Begin Date | End Date |
|----|-------------|----------|------------|----------|
| F43.10 | Posttraumatic stress disorder | 1 | 02/10/2020 | |
| F41.1 | Generalized anxiety disorder | 2 | 02/10/2020 | |
| F10.20 | Alcohol use disorder, Severe | 3 | 12/22/2015 | |
| F12.20 | Cannabis use disorder, Severe | 4 | 08/05/2020 | |

**Medical Conditions: (As reported by Consumer)**

SEIZURE D/O
MS
IBS

**Important Psychosocial and Contextual Factors**

| ID | Description | Priority | Begin Date | End Date |
|----|-------------|----------|------------|----------|
| Z59.6 | Low income | 1 | 12/22/2015 | |
| Z91.49 | Other personal history of psycholog | 2 | 12/22/2015 | |

Social elements impacting diagnosis and functional assessments
Financial Problems
Problems with Legal Systems
Occupational Problems
Medical Conditions

Co-occurring Disorders?               ⦿ Yes      ○ No

Is consumer under 18 years of age?    ○ Yes      ⦿ No          Age today:  41

GAF Score  51                CGAS  0

Services Recommended:

☐ No Treatment Recommended

☐ Care Coordination

☒ Community Support Services (Individual/Group)

☒ MH Case Management

☒ MH Client Centered Consultation Case Management

☐ Psychotropic Medication Monitoring

☐ Psychotropic Self- Medication Training

☐ Recreational

☐ SA Case Management

☐ Telepsych Evaluation

☐ Telepsych Medication Check

His insight as well as his judgment is considered to be impaired and he is considered to be potentially dangerous to others although he currently denies any homicidal ideation.

## DISPOSITION:

On the basis of my current evaluation of Eric Clements' psychiatric condition it is my professional opinion that he does not meet criteria for certification under C.R.S. 27-10-107. Eric also clearly demonstrates a lack of motivation to be involved in any type of psychiatric treatment and therefore, is not likely to benefit from voluntary hospitalization. He does however acknowledge the need for discipline and structure in his life and stated that he would like to be involved in "a bootcamp" type of experience or military school. Therefore, my recommendation to the court is that Eric be committed to the Division of Youth Corrections and be placed at the Lookout Mountain Facility for a period of no less than one to two years so that he may be able to reside in an environment that will provide consistent structure and limit setting as well as foster a sense of responsibility by holding him accountable for his behaviors. It will also be important, however, to initially closely monitor Eric for suicidal as well as assaultive behaviors within the correctional facility until he is able to make an adequate adjustment to that setting.

## DIAGNOSIS:

| | |
|---|---|
| Axis I | Oppositional Defiant Disorder, Intermittent Explosive Disorder, R/O Post Traumatic Stress Disorder, R/O Mood Disorder |
| Axis II | At Risk for Developing Borderline Personality Disorder, At Risk for Developing Antisocial Personality Disorder |
| Axis III | Healthy Appearing Male |
| Axis IV | Problems Related to the Social Environment including Difficulties Interacting with Peers and Problems Related to Interaction with the Legal System |
| Axis V | GAF 40 (current) |

Respectfully Submitted,

Raymond Ruiz, Psy.D.
Licensed Clinical Psychologist
Adolescent Inpatient Service Unit
CMHI - Fort Logan

Jean VanDePolder, M.D.
Clinical Psychiatrist
Adolescent Inpatient Service Unit
CMHI - Fort Logan



# Request for Testing Accommodations
## Emotional/Mental Health

Candidate's Last 4 SSN/SIN

## Section 3A: Emotional/Mental Health Impairment

To be completed by the professional diagnostician or person helping you complete this form.

To request accommodations for an Emotional/Mental Health disability, the current level of impairment and resulting functional limitations must be clearly documented, as well as any history that can be provided. Documentation should also state a specific recommendation(s) for accommodations and the accompanying rationale.

Documentation must include a letter on official letterhead, signed by a certifying professional who specializes in the diagnosis of the disability, and providing supporting documentation of this disability.

☐ Supporting documentation on professional diagnostician's letterhead attached. (Required.)

DSM-IV Code: 296.44 / 345.90    Diagnosis: Bipolar + ADHD / Seizures

Condition:

Functional Limitations: Slow thinking process (Time element)

Recommended accommodation(s):

Rationale for accommodation(s):

## Section 3B: Requested Accommodations

Please identify those accommodations that support the diagnosed disability.

☐ Extended Time (please specify):   ☐ 1-1/2 times   ☒ 2 times   ☐ Other: _____

☐ Audiocassette (tone-indexed) (requires extended testing time, generally double time)
   ☒ 2 times   ☐ Other _____
   *The use of this accommodation requires practice. Candidates should have an opportunity to practice using an Official GED Practice Test, Audiocassette Version prior to scheduled testing date.*

☐ Braille

☐ Scribe

☒ Calculator for Part II

☐ Talking Calculator for Entire Mathematics Test

☐ Private Room

☐ Supervised Breaks (specify in minutes):
   Uninterrupted testing time: _____ minutes, break time: _____ minutes

☐ Other _____

## Section 3C: Other Information and Supporting Documents

This section may be completed by the candidate or by his or her certifying professional or advocate. Provide any additional information you wish to be considered when this request for accommodations is reviewed.

General Educational Development (GED) Testing Service will not discriminate against candidates for testing on the basis of any legally protected characteristic, including, but not limited to, race, color, religion, sex, sexual orientation, pregnancy, marital status, physical or mental disability, age, veteran status, and national origin.

# Health Center of Eastern LaSalle County

315 E. McKinley Rd. Ottawa, IL 61350 • 815-431-0400 • healthcenterelc@sbcglobal.net

2-17-10

To Whom This May Concern:

Eric Clements is a patient, being treated for his Mental Illness of BiPolar and is on Lithium 150 mg. daily.

Thank You,

L. Freehill
administrator

Doctor's signature

X



United Way

Eric Steven Clements #032635-0

## FINAL DIAGNOSIS:

Axis I       Conduct Disorder, Solitary Aggressive Type
             Post Traumatic Stress Disorder, Undifferentiated
             Somatic Form Disorder (Pseudo seizures)
Axis II      Borderline, Dependent and Narcissistic Personality
             Traits
Axis III     History of Petit mal seizures
             Acne
Axis IV      Severe
Axis V       Fair to Good


SIGNATURE:   (Attending Psychiatrist)

*Nan DePoeder, M.D.*

Karen Kraus, M.D.
Attending Psychiatrist
Children's II Team


KK:11(C)
07/17/94
07/19/94
07/28/94.(8/9/(4)



3:05  📘 M 😊 •                              🔇 LTE ▪️📶

# Eric Clements

Ottawa, IL 61350
eclements022@gmail.com
+1 815 993 0277

## Work Experience

**Caregiver for Elderly**
Private Home & Personal Care - Ottawa, IL
February 2009 to Present

I take care of my 90 year old grandmother that I live with

**Janitorial Worker**
KBS - Ottawa, IL
September 2020 to December 2020

Drove tug around pets mart DC picking up empty boxes and used plastic wrap and collected garbage and put boxes and plastic in baler

**Sanitation services at cookie kingdom**
Cookie Kingdom - Oglesby, IL
September 2015 to December 2015

Wash machines take out trash clean bathrooms restock bathroom products clean lunch room sweep mop

**Forklift Operator/Warehouse machine operator**
GRAINCO FS - Ottawa, IL
February 2015 to May 2015

Sent bags through machine to be filled with product and stacked on pallet then I use forklift to stack in warehouse then I load orders on trucks and I offload unused pallets from truck

**Assembly Line Worker**
B&B Electronics - Ottawa, IL
March 2011 to January 2012

Sauder wires to boards test board connections package product label box stack box

**Machine Operator**
Cookie Kingdom - Oglesby, IL
August 2010 to February 2011

I put cookie dough in the machine watched it roll out taking off the bad one's then at the end of my shift I had to take apart the machine and clean it

**First Mate/Deckhand**
Artco marine garvy marine - Ottawa, IL
February 2005 to May 2006

Welding painting engine room work pumping water out of tanks directing traffic cleaning barges heavy labor general cleaning

## Education

**High school or equivalent**

**High school or equivalent**
Ivcc - Ottawa, IL

## Skills

- Janitorial (3 years)
- Cleaning (10+ years)
- Warehouse (4 years)
- Commercial Cleaning (2 years)
- Order Picking
- Laundry
- Forklift (2 years)
- Residential Cleaning
- Packaging (4 years)
- Materials Handling (4 years)
- Assembly (4 years)

    

EXHIBIT #4 ZIP-PaK employee admitted to me saying That He toLd Co. woRKeR ~~Nicholas~~ Nicholas RiLey and management Tha I attemPTed TO sexually molest him, even Though The accusations aRe Lies, The accusations ~~involve~~ involve male on male sex equal To LGBTQ THeReFoR The emPLoyeR did have KnowLedge oF my LGBTQ sex oRienTaTion do To ZiP-PaK employee NoAH BLaKLey maKing sexual accusaTions aBouT me To management as NOAH BLaKLey admiTTed To TeLLing management, THis again PRoves ZiP-PaK To Be Lying aBouT Having no KnowLedge oF my sexual oRienTaTion.

EXHIBIT #5 is a EMaiL FRom ZiP-PaK H.R. sTaTing ZiP-PaK was imPRessed by my SKiLLs and accomPLisHmenTs. sTaTing THaT ZiP-PaK THinKS I couLd Be a good FiT FoR anoTHeR FuTuRe oPening, and wouLd ReacH ouT again iF THey Find a good ~~cut~~ MaTCH.

(exHiBiT #5 cleaRLy PRoves I was noT HiRed FoR LacK oF SKiLLs as ZiP-PaK was imPRessed wiTH my SKiLLs.)



**Noan Blakiey**

pak which do to my current charges against zip pak
it might lead to me being hired as part of the
settlement so if you wanna prevent future drama
then I need to know the name of the CO worker you
told about me otherwise if im hired and I get
sexually harassed in any way gossip or whatever at
work its gunna fall on you now I don't want that to
happen and thats why I need the name of ur CO
worker that you told and if you can't tell me then ur
just admitting to telling ur CO worker because no
answer is just as good as admitting to doing it after
all you already told me verbally that you told one of
ur CO workers but if you can't tell me ur CO worker's
name that you told then zip pak needs to be told
that you told a CO worker which is classified as
sexual harassment and a hostile worker you can
either help me or not its up to you but I got to do
something to protect myself if im hired since you
already told ur CO worker

ME

I just don't want you to be the blame if someone
starts in on me if im hired so I'm asking for ur own
good bro

NOAH BLAKLEY

I kept everything disclosed there were only a couple
I told about the incident but it was a small summary
so they don't know details just about that u tried to
==molest== me which was ==nick== but he won't say anything
about it he just told me to let ==management== know I
said I'm comfortable with u workin here just I didn't
want u to work on my shift



Case: 1:23-cv-01066 Document #: 1 Filed: 02/22/23 Page 29 of 85 PageID #:29



6:08

# Thanks for applying at ZIP-PAK

Inbox

**Lindi Parcher from ZIP-PAK** Jul 1
to me

Eric,

Thank you for your interest in the Machine Operator - Extrusion position at ZIP-PAK. It was a pleasure to learn more about your skills and accomplishments.  Unfortunately, we have chosen to move forward with a different candidate for the Machine Operator - Extrusion position. ==Our team was impressed by your skills and accomplishments.  We think you could be a good fit for other future openings and will reach out again if we find a good match.==

I wish you the best of luck in your job search.

Best regards,
Lindi Parcher

Sent via **SmartRecruiters**, your hiring success platform. Learn more about our company and policies **here**.

9

**Eric Clements** 3 days ago
to 189af402-f46a-42dd-948a-b...

You claim I could be a good fit for future openings well another machine operator position was posted by zip pak on 6/22/2022 long after my interview so I guess you people never had any plans on hiring me over 40 years old

EXHIBIT#6 CONFIRMS my IN PERSON INTERVIEW WHICH allowed THE employeR/HIRING MANAGER TO PHYSICALLY see my image seeing my GRAY FACIAL HAIR, Leading TO THE STEREOTYPE and assumption THAT I am over THE age OF 40 WHICH IS CORRECT since I TURN 42 on 2-25-2023

EXHIBIT#7 CONFIRMS THE PERSON ZIP-PaK HIRED INSTEAD OF HIRING me IS 36 OR 37 YEARS old, PROVING age TO Be a FACTOR IN NOT HIRING me OVER 40 years OF age PROVING THAT I was TReatted less FAVORbLY equal TO PRIMA FACIE

EXHIBIT#8 NOAH BLAKLEY admITTS/CONFIRMS He Had no PRIOR machINE opeRaTOR expeRience, and goT all HIS machIne opeRaTOR TRainING aT ZIP-PaK.

EXHIBIT#7 and eXHIBiT#8 CONFIRM ZIP-PaK WILL HiRe and TRain anyone under THe age 40, BUT not PeoPLe 40 and over, disaBLed, LGBTQ Like myseLF.

*EXHIBIT #6*



# INTERVIEW GUIDE: Hourly Employee

APPLICANT: Eric Clements

INTERVIEWER: Lindi Parcher/Joe Kubly

POSITION: Machine Operator

DATE: 6-16-22 Phone Screen

6-23-22 In-person interview

EXHIBIT #7

Intake Interview
July 28, 2022
DG

Eric Clements                              v.                    Zip Pak

PCP is alleging Age; Hiring

PCP DOB: 2/25/1981

PCP actually said there's a lot of reasons; disability, he has multiple disabilities; he has an employee who works there who accuses PCP of being gay so CPP said you might as well put him in that category as well

So PCP thinks he spread rumors

PCP's uncle applied there way over 40 and a Navy Seal and experienced electrician but they won't hire him

So why do they hire all these younger people but not him

PCP has epilepsy, Addison's disease' "So many mental disabilities I am diagnosed with" PTSD, he can go on and on, so that's the evidence he wants to send

PCP says R is in violation of the ban the box law, because they asked PCP if he has a criminal background, and even though he does it is very old; and PCP was honest with him; thinking R wouldn't use it against him but they must have

PCP applied for a Machine Operator position

R hired a 36 or 37-year-old

PCP applied – PCP states he doesn't remember when he applied but applied numerous times; beginning June 2022
PCP found out he wasn't hired on July 1, he received an email

PCP states that he had 3 interviews w/ R; HR person, the hiring manager, and the HR lady again, and then R decided not to hire PCP

They hired PCP the younger person; R said they liked his skills and how he presented and was a possible candidate for a future opening in the company

Felt like R was giving him a lame excuse to keep him quiet and shut him up, and that's why R hasn't even hired him for a position

Every time he sees a position open, he files an application

He feels like he's being ignored

PCP was also asked why he has long periods of unemployment; PCP says he's disabled and has a 90-year old blind grandmother, so he has reasons he missed work for periods of time but that's something he's protected from by the ADA according to PCP

So that question is extremely wrong and not allowed per the ADA according to PCP

"There's all kinds of violations here" and in violation of many other things; PCP is listing Exec Orders and other laws or other issues

PCP states that R may not hire him because he also posted something on Facebook; when the ee said he was gay and R wouldn't hire him, he had a mental breakdown and attempted suicide during these rumors and that's why he was so hurt; and the cops came to his house to take him to the hospital and he posted online that the cops came to his house, and that he was depressed and used against him, and has mental disabilities, and going through a bad mental stage, he expresses things on facebook

PCP chose to file



**Noah Blakley**

ME

Should have came over

Smoked with me

ME

Hey bud

Have you ever had a job being a machine operator before zip-pak

Or did you get all your machine operators training at zip-pak

YOU DELETED A CHAT

NOAH BLAKLEY

I got it at Zippak

☐ Opened

☐ Opened

ME

Oh I was wondering if you had ever been a machine operator before

How you doing today bud

NOAH BLAKLEY

Tired as hell not gonna lie

ME

I'm out of everything until tomorrow

I miss you bud

ME

Im bout to spend 900 at the dispensary

Send a chat

2/9/23, 11:42 AM
Screenshot_20230401-234627_Chrome.jpg

*(handwritten: E.7  EXHIBIT #8)*

11:46  •  LTE

# Religion

The law requires an employer to reasonably accommodate an employee's religious beliefs or practices, unless doing so would cause difficulty or expense for the employer. This means an employer may have to make reasonable adjustments at work that will allow the employee to practice his or her religion, such as allowing an employee to voluntarily swap shifts with a co- worker so that he or she can attend religious services.

# Training & Apprenticeship Programs

It is illegal for a training or apprenticeship program to discriminate on the bases of race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not deny training opportunities to African-American employees because of their race.

In some situations, an employer may be allowed to set age limits for participation in an apprenticeship program.

# Harassment

EXHIBIT #7 (6)

**DIVE BRIEF**

# EEOC: Employers cannot favor 'early career' hires over older candidates

Published Oct. 5, 2022

By
Laurel KalserContributor

- 
- 
- 
- 
-



*SolStock via Getty Images*

Listen to the article 5 min

## Dive Brief:

- Pharmaceutical giant Lilly USA allegedly failed to hire older workers for sales jobs in favor of millennials so its workforce would be better "distributed ... by generation," the U.S. Equal Employment Opportunity Commission said in a Sept. 26 lawsuit (*EEOC v. Lilly USA, LLC*, No. 22-01882 (S.D. Ind. Sept. 26, 2022)).

- In 2017, Lilly's senior vice president for HR and diversity recognized at a leadership town hall that Lilly's workforce was composed of primarily older workers, according to the lawsuit. He then announced goals for 40% "early career" hiring to add more millennials, the complaint claimed. Thereafter, Lilly allegedly changed its hiring preferences and practices to intentionally under-hire older applicants for sales representative positions. For example, it imposed higher levels of review and approval before hiring older candidates for certain jobs, the EEOC said.
- The agency sued Lilly for violating the Age Discrimination in Employment Act, which prohibits discrimination against applicants age 40 and over. Lilly denied the allegations, it told HR Dive in an email. "Lilly is an EEO/Affirmative Action Employer and does not discriminate on the basis of age, race, color, religion, gender, sexual orientation, gender identity, gender expression, national origin, protected veteran status, disability or any other legally protected status. We … remain committed to fostering and promoting a culture of diversity and respect," the company said.

- 

Get the Free Newsletter

**Dive Insight:**

The reminder here is that when recruiting and hiring millennials or Generation Z, it's important not to shut out baby boomers and other older workers. Targeted practices like those alleged in EEOC's lawsuit may not only deprive an employer's talent base of important skills — such as increased loyalty and the ability to establish customer networks, a report from Indeed points out — they may also be illegal under the ADEA.

The statute prohibits age discrimination in any aspect of employment, including hiring, an EEOC guidance explains. Also, employers may run afoul of the law (even if unintentionally) with neutral employment practices — those that apply to everyone regardless of age — if these practices have a negative impact on applicants or employees 40 or over, former EEOC Chair Victoria Lipnic noted in a 2018 statement marking the ADEA's 50th anniversary.

For example, employers should watch for job ads that employ dog whistles for ageism. Certain code words, such as "fresh," "tech savvy," "digital native," "flexible," "energetic," "active" and "high potential," can signal age bias, the Indeed report said. During the screening process, employers may unintentionally promote ageism by rejecting

<mark>applicants who lack a social media presence</mark> or have a college graduation date from more than 20 years ago, the report added.

Employers can still lawfully attract millennials, a Society for Human Resource Management post explained, suggesting recruiters emphasize what millennials find important, such as performance-based compensation, flexible schedules and locations, access to decision-makers and a clear area of responsibility. But there are caveats: Don't promise what you don't offer. Don't generalize; not all members of a generation want the same thing. And don't discourage older applicants, the post cautions.

Findings by AARP revealed another way older workers may be overlooked. In a 2020 survey, more than half of the 6,000 global employers who responded said they don't include age in their diversity, equity and inclusion policies.

In general, employers should be aware that if not handled properly, diversity efforts may prompt lawsuits, attorneys Reed Russell and Julie Girard warned in a Florida Bar Journal article. A case from 2021 illustrates the risk: After a White male former executive was fired, he sued his employer, claiming he had received strong evaluations and was told by his supervisor that his termination had nothing to do with his performance. He also alleged that he was replaced by a Black woman and a White woman.

The employer argued he was fired for performance problems, not to meet diversity goals. A federal jury rejected the argument and awarded the executive $10 million (a number that was later cut to comply with statutory caps) after concluding that race and sex were motivating factors in the decision to terminate him.

- POST
- SHARE
- TWEET
- PRINT
- EMAIL

Filed Under: **Compliance**

EXHiBiT #9 pg #3 employer admits To Telling me THaT I sHould Be Ready To addRess any employment GaPs, (on 6-23-2022 aT my in PeRson JoB inTeRVIew I was asked aBouT employment GaPs, and I STaTed The Reason FoR my employment GaPs is disaBILiTy ReLaTed

EXHiBiT #9 Pg #3 a CONFLICT caused By TempoRaRy insaniTy do To my disaBiLiTy/PTSD and Low Blow sugaR/HyPoglycemia can noT Be used against me wiTHouT discRiminating against me Because oF my disaBiLiTies exHiBiT #9 PRoves iT is discRiminaTion and ILlegal To use a incidenT caused By PTSD againsT me

EXHiBiT #9 Pg #3 THe emPloyeR says THaT I said I geT FRusTRaTed wHen I geT imPRoPeR TRaining and That is a Lie I neveR said THaT.

EXHiBiT #9 emPloyeR makes THe steReoTyPe assumPTion THaT I donT Have comPuTeR skILLs, THis is discRiminaTion, and a inaccuRaTe assumPTion, steReoTyPe, THis assumPTion is made Based oFF THe HiRing manageRs steReoTyPe/assumPTion THaT I am oveR 40 as STaTed in EXHiBiT #6

# ^ NORTON ROSE FULBRIGHT

October 21, 2022

**EEOC Portal**

Norton Rose Fulbright US LLP
444 W. Lake Street, Suite 1700
Chicago, Illinois 60606
United States of America

U.S. Equal Employment Opportunity Commission
Chicago District Office
230 S. Dearborn Street
Chicago, IL 60604

Direct line +1 312 964 7735
marykathryn.curry@nortonrosefulbright.com

Tel +1 312 964 7800
Fax +312 964 7799

*EXHIBIT #9*

Re:     EEOC 440-2022-06814
        Eric Clements v. Zip-Pak, an ITW Company

Dear EEOC Officer:

I am writing on behalf of the Respondent, Zip-Pak, an ITW Company (**Zip-Pak**), in response to the Charge of Discrimination filed by Eric Clements. Mr. Clements alleges discrimination based on age, disability, and sex.

Zip-Pak denies Mr. Clements' age, disability, or sexual orientation was considered in any way in the fact-motivated decision when considering his application for employment. Zip-Pak made all decisions with respect to Mr. Clements prospective employment for legitimate non-discriminatory business reasons completely unrelated to any of these allegations. After a review of this position statement and supporting documentation, Zip-Pak is confident that the EEOC will reach the same conclusion.

This position statement is intended to respond to the allegations contained in the Charge. Before going forward, please note that the information set forth in this letter, and the attached exhibits, are privileged in that they are submitted to a governmental investigative agency in response to its request for information and a position statement. This statement is offered with the understanding that it will be inadmissible in evidence as hearsay and as a statement made in compromise negotiations. Further, this statement is based upon Zip-Pak's understanding and investigation of the facts at this time. By submitting this position statement, Zip-Pak does not waive its right to present new or additional facts or arguments based upon subsequently acquired information or evidence, or to amend or correct the contents of this statement if necessary. This position statement does not constitute an affidavit, and is not intended to be used as evidence of any kind in any agency or court proceeding in connection with the Charge or any other matter. Zip-Pak does not waive any defenses, whether substantive or procedural, it may have to this Charge, all of which are expressly reserved. Finally, by providing information or material, regardless of its purpose, Zip-Pak does not waive any objection to the admissibility, materiality, or relevancy of such information or material in this or any other proceeding.

1.     <u>Background</u>. Zip-Pak has been in business in the greater Chicago area for over 100 years, providing thousands of local area families with quality manufacturing jobs, good pay and benefits, including health insurance and a retirement plan. Respondent's Zip-Pak business is headquartered in Carol Stream, Illinois and employs approximately 175 workers in

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

U.S. Equal Employment Opportunity Commission
October 21, 2022
Page 2

NORTON ROSE FULBRIGHT

administrative, engineering and manufacturing of resealable packaging. The Respondent is an Equal Opportunity Employer with respect to all aspects of recruiting, hiring, wages, benefits and other terms and conditions of employment, Company sponsored activities, discipline and tenure.

Zip-Pak makes *all* employment decisions without regard to religion, color, national origin, gender, sexual orientation, age, disability, marital status, political belief, military status or on any other basis which would be in violation of any applicable federal, state or local law. Zip-Pak does not tolerate racial or any other harassment and has a robust policy on Prohibition Against Discrimination and Harassment in their Employee Handbook of Policy and Procedure that is distributed to employees on their first day of employment. Further, Zip-Pak provides its employees, through the Policy on Discrimination/Harassment, several avenues to address complaints of harassment, discrimination and retaliation.

Zip-Pak also publishes their commitment to equal opportunity in employment on their website so that individuals interested in joining their team receive affirmation of their commitment to an environment free of harassment, discrimination and/or retaliation. The website further provides that Zip-Pak is committed to:

- Fostering inclusive environments where differences are valued and employees are comfortable expressing their ideas and doing their best.

- Attracting and retaining a diverse workforce.

- Cultivating business opportunities and customer and supplier relationships across diverse markets and demographic segments.

- Building stronger communities through philanthropic and service activities that address diverse needs. (See https://zippak.com/about-us/careers/)

2.  The Charge. Mr. Clements alleges that he was discriminated against during his job application process on the basis of his age, disability and sexual orientation in violation of The Age Discrimination in Employment Act (ADEA), The Americans With Disabilities Act of 1990 (ADA), and Title VII of the Civil Rights Act of 1964 (Title VII).

Zip-Pak denies that Mr. Clements was subjected to any discrimination or harassment. On the contrary, Mr. Clements was treated fairly and any employment decisions made by Zip-Pak with respect to potential employment were for legitimate non-discriminatory reasons and unrelated to any of his allegations, which are addressed below.

3.  Mr. Clements' Application Process with Zip-Pak.

At the outset it should be noted that Mr. Clements was not, and has never been, an employee of Zip-Pak; rather, he applied to positions with Zip-Pak. In May 2022, Mr. Clements applied for a Lab Technician role at the Carol Stream, Illinois, Zip-Pak location and was not selected for an initial phone interview or in-person interview because the Carol Stream facility decided to hire a local candidate for the entry-level pay position. Mr. Clements resided in Ottawa, Illinois, near a different Zip-Pak plant.

U.S. Equal Employment Opportunity Commission
October 21, 2022
Page 3

NORTON ROSE FULBRIGHT

On Sunday, June 5, 2022, Mr. Clements submitted a complaint through the ITW Zip-Pak PipeDrive Leads website requesting to speak with human resources about discrimination in the hiring process. Specifically, Mr. Clements wrote "I need to talk to human resources about hiring discrimination against disabled people like myself in Ottawa Illinois as I've submitted several applications and I know of several persons hired with less experience than me." (Exhibit 1.) In response, Nick Caliendo, the Human Resources Manager, reached out to Mr. Clements on June 7, 2022, to discuss his complaint.

It was during the June 7, 2022, conversation that Mr. Caliendo first viewed Mr. Clements' on-line application for employment, which was housed on the Zip-Pak Smart Recruiter website. Mr. Caliendo determined that Mr. Clements had applied for a Lab Technician position at their headquarters in Carol Stream, Illinois, versus Ottawa, Illinois where he resided. Mr. Caliendo informed Mr. Clements that he was not selected for a phone or in-person interview due to the facility wanting a local candidate. Mr. Caliendo also told Mr. Clements that neither he, nor anyone on the hiring team, had knowledge or documentation of any disability he may have given that he applied to Zip-Pak through the on-line application platform and no-one knew him personally, or would have access to that type of information. Mr. Caliendo took time to provide Mr. Clements with constructive feedback on his resume and application so in the future, hiring decisionmakers had sufficient information to evaluate his skills. Mr. Caliendo also indicated that Mr. Clements should be prepared to address any employment gaps. The conversation concluded with Mr. Caliendo advising Mr. Clements that if a role opened up that he was qualified for, Zip-Pak would consider his application.

Meanwhile, on June 6, 2022, Zip-Pak determined that they would be seeking one or two individuals to fill Machine Operator - Extruder roles at the Ottawa, Illinois plant. Mr. Clements submitted his on-line application and on June 13, 2022, the hiring team reached out to schedule a telephone interview. Following the telephone interview, the hiring team then scheduled Mr. Clements for an in-person interview on June 23, 2022. During this on-site interview, Mr. Clements mentioned that while he was working for a different employer, he had a conflict with a co-worker and that co-worker reported the conflict to their management. Mr. Clements indicated that he was frustrated that his prior employer found fault with his behavior, not the coworker, and subsequently chose to leave the role. He also indicated that he gets frustrated when he receives what he feels is improper training, making the comment, that is when things "fall apart." (Exhibit 2.) Based on his lack of computer skills, along with Mr. Clements' other responses to the interview questions, the hiring team decided to move forward with more qualified candidates. On July 1, 2022, Mr. Clements was notified by Zip-Pak that he was not selected for the position and they were pursuing other candidates for the Machine Operator – Extruder role. (Exhibit 3). The Machine Operator – Extruder job description is attached as Exhibit 4.

Between July 1, 2022 and July 6, 2022 Mr. Clements sent the Zip-Pack recruiter five emails accusing Zip-Pak of discriminating against him because he was gay, he has a disability, that he was over forty, that a crime was committed against him, and that other current employees were making complaints against him. (Exhibit 5). At no time did *any* Zip-Pak Human Resources team member have any knowledge of these allegations until these emails were received.

U.S. Equal Employment Opportunity Commission
October 21, 2022
Page 4

NORTON ROSE FULBRIGHT

4.     Response to Mr. Clements' Allegations in the Charge.

Mr. Clements claims that he applied for multiple positions with Respondent in or around June 2022. We know that Mr. Clements applied for at least two positions with Zip-Pak. Zip-Pak interviewed him for one of those positions, noted above, the Machine Operator – Extruder role at the Ottawa, Illinois plant. Mr. Clements claims that he was subjected to harassment and asked about his criminal background during his interview. These claims are patently false. As outlined above, at no time did *any* Zip-Pak Human Resources team member have any knowledge of his sexual orientation, disability status, age, criminal history, or his allegations that other current employees were making complaints against him. It was only after Mr. Clements was notified that he would not be selected for the Machine Operator – Extruder role that he emailed a Zip-Pak recruiter, and affirmatively stated that Zip-Pak discriminates against those "that are disabled or LGBQ like myself" and referenced being over 40 (See Exhibit 5, page 2). Again, this information was shared with Zip-Pak only *after* he was not selected for a position at Zip-Pak. Therefore, the allegations that Mr. Clements was discriminated against based on his age, disability, and sexual orientation are simply not true. As described above, Mr. Clements was treated fairly, in that Zip-Pak responded with courtesy to Mr. Clements' initial frustration that he was not selected for an interview. In fact, Mr. Caliendo, the Human Resources Manager, took time to review suggestions with him, and advise Mr. Clements regarding how best to apply for future roles.

Later, when Zip-Pak had the opportunity to interview Mr. Clements, it made its employment decision based on legitimate, non-discriminatory reasons, completely unrelated to any of Mr. Clements' allegations because, importantly, Zip-Pak did not know about any of the alleged claims at the time of the interview or hiring decision. Further, Mr. Clements admitted that he was not qualified for the Machine Operator – Extruder role when he noted his lack of computer skills. He also admitted that he does not take feedback on his work performance well, and commented on training requirements, all of which provided sufficient information to the hiring team to determine that other candidates were more qualified to move forward.

5.     Mr. Clements' Discrimination Claims Have No Legal Basis.

Mr. Clements was treated fairly and the decisions made by Zip-Pak with respect to Mr. Clements' potential employment were for legitimate non-discriminatory reasons. The facts clearly show that Mr. Clements was not subjected to any type of discrimination by Zip-Pak. When Mr. Clements made a complaint, Zip-Pak followed defined company policy to investigate and address the allegation. Importantly, Zip-Pak had no knowledge of Mr. Clements' sexual orientation, his age, or that that he had a disability (if, in fact, that is true), until being told by Mr. Clements himself, which he did only after he was notified that he was not selected for the Machine Operator – Extruder position. Put simply, Mr. Clements has not provided evidence of how any of these attributes – sexual orientation, disability, or age – would have been considered in the hiring process. Furthermore, for each job applied to, Zip-Pak had a legitimate, non-discriminatory basis for the decision not to interview (for the initial position) and the decision to move forward with more qualified candidates (for the second position).

Title VII principles apply to all of Mr. Clements' causes of action. Cases alleging discriminatory treatment under Title VII require direct or circumstantial evidence that there was

U.S. Equal Employment Opportunity Commission
October 21, 2022
Page 5

NORTON ROSE FULBRIGHT

disparate treatment based on a legally prohibited factor with respect to the terms of employment. In other words, that sexual orientation, or his disability, or his age was the determining factor in the employment decision. *See Johnson v. Beach Park Sch. Dist.*, 103 F. Supp. 3d 931, 933 (N.D. Ill. 2015), aff'd, 638 F. App'x 501 (7th Cir. 2016); *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 341 (7th Cir. 2017) (finding sexual orientation a form of sex discrimination). With no direct evidence, Mr. Clements would need to show:

1.  He is a member of a protected class; [YES]
2.  He applied for and was qualified for the job; [NO]
3.  Despite qualifications, he was not hired for the job; [NO] and
4.  Others similarly situated but not in the protected class were treated more favorably. [NO]

*Kehrer v. City of Springfield*, 104 F. Supp. 2d 1001, 1007 (C.D. Ill. 2000)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see also Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003). Of the four requirements to establish a prima facie case of unlawful discrimination, Mr. Clements meets only one, that he is a member of a protected class (based on his sexual orientation, alleged disability, or age). As to the additional factors required to establish a prima facie case, they are not applicable because he was not qualified for the positions .

### A. Sexual Orientation

First, Mr. Clements has offered no evidence that Zip-Pak even knew about his sexual orientation until he notified human resources in an email, *after* he found out that he was not selected for the positions. Even if Mr. Clements was able to establish a prima facie case of sex discrimination, which he cannot, the burden of production would shift to Zip-Pak to articulate a legitimate, nondiscriminatory reason for the hiring decisions they made, which they have done.

For the foregoing reasons, Mr. Clements has failed to meet even the basic prima facie requirements to establish a case worthy of investigation. Title VII prohibits only intentional discrimination based upon an employee's protected class characteristics. *Braun v. St. Pius X Parish*, 827 F.Supp.2d 1312 (N.D. OK, 2011). The instant Charge is void of factual allegations indicative of such unlawful intent. An analysis of the Charge reveals only that Mr. Clements believed he was qualified to perform open positions at Zip-Pak, nothing more.

The Commission, and the overwhelming majority of Courts, have held that a charging party must prove that "but for" the prohibited factor (sexual orientation), the adverse employment decision would not have been made, or that the charging party's membership in a protected class was the "determinative factor" in the adverse employment decision. *Laugesen v. Anaconda Co.*, 510 F.2d 507 (6th Cir. 1975); *Carter v. Maloney Trucking Co.*, 631 F.2d 40 (4th Cir. 1980); *Geller v. Markham*, 635 F.2d 1027 (2nd Cir. 1980), cert. den. 451 U.S. 945 (1981); *Ursery v. General Electric Co.*, 13 FEP 1641 (M.D. TN 1976). Here, Mr. Clements has offered no evidence (direct, indirect, circumstantial or disparate treatment) that his sexual orientation played any factor in not being hired.  Mr. Clements also cannot prove he was treated less favorably than similarly situated employees who were not members of the protected class, under nearly identical

U.S. Equal Employment Opportunity Commission
October 21, 2022
Page 6

NORTON ROSE FULBRIGHT

circumstances. As set out above, even if Mr. Clements can establish a prima facie case, the Company has established a bona fide, business related, nondiscriminatory basis for its personnel actions and Mr. Clements will not be able to prove these reasons are a "mere pretext" for some discriminatory act.

### B. Disability

Second, Mr. Clements also alleges discrimination based on an unknown disability because he was not hired for positions at Zip-Pak. This is patently false. The Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act (ADAAA) (42 U.S.C. §§ 12101 to 12213) prohibits employers from discriminating against qualified individuals with a disability. The ADA covers employees and job applicants who are qualified for the position held or desired and prevents discrimination against these individuals based on disability (42 U.S.C. § 12112(a)). A disability under the ADA means a physical or mental impairment that substantially limits a major life activity.

After Mr. Clements was not selected for a position at the company, he made an on-line complaint (See Exhibit 1). The company followed protocol and investigated the claim, where they determined they did not know about Mr. Clements' disability until he raised it, which was after he had applied and was not selected for an interview. Importantly, after Mr. Clements' indicated that he had a disability (which we do not know to be true), Zip-Pak invited him to continue to apply for positions and informed him that he would be considered for all positions for which he was qualified.

Zip-Pak then *selected* Mr. Clements for an interview for the Machine Operator – Extruder  position. Even then, the only knowledge Zip-Pak had (and still has) of any alleged disability is Mr. Clements' claim that he, in fact, has a disability. Zip-Pak has no knowledge of what that disability may be.  Therefore, at no point in the hiring process did Zip-Pak consider Mr. Clements' disability, nor did they consider it in reviewing his qualifications for a position. There is simply no proof that Zip-Pak discriminated against Mr. Clements in any way.

### C. Age

Third, Mr. Clements has not offered any direct evidence that Zip-Pak discriminated against him by reason of his age. The analysis then shifts to the indirect method of proof set out in *McDonnell Douglas* where Mr. Clements has the initial burden of putting forth sufficient evidence to establish that he was forty years of age or older, he applied and was qualified for the position, he was not hired for the job, and Zip-Pak hired someone outside of the protected class with similar or lesser credentials. *Lawhead v. Ceridian Corp.*, 463 F.Supp.2d 856, 862 (N.D.Ill.2006) (*citing Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir.2003)). Zip-Pak does not dispute that Mr. Clements is a member of a protected class for the purposes of an ADEA claim, or that he was not hired. Rather, Zip-Pak asserts that Mr. Clements has not put forth sufficient evidence establishing that he was qualified for the position for which he applied, or that someone younger than Mr. Clements was hired instead. *See Johnson v. Beach Park Sch. Dist.*, 103 F. Supp. 3d 931, 936 (N.D. Ill. 2015), aff'd, 638 F. App'x 501 (7th Cir. 2016).

U.S. Equal Employment Opportunity Commission
October 21, 2022
Page 7

NORTON ROSE FULBRIGHT

In *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the Supreme Court explained a prima facie case of age discrimination "requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." No evidence – of any quantum or quality – has been offered by Mr. Clements to support his age allegation. In *Gross v. FBL Financial Services Inc.*, No. 08-441, 2009 WL 1685684 (2009), the U.S. Supreme Court held that an age discrimination plaintiff cannot prevail by showing age was only one of several factors motivating an adverse employment decision; they must show that age was the decisive factor behind an adverse employment action. Mr. Clements is unable to produce any evidence that age was a factor at all, much less the required decisive factor. Mr. Clements has offered no evidence that his age played any factor in not being hired. In fact, at no point during the interview process did Zip-Pak know Mr. Clements' age, nor did he reveal his age in any communication to Zip-Pak until after he was notified that Zip-Pak was moving forward with another candidate for the Machine Operator - Extruder Role. (Exhibits 3 and 5.)

Mr. Clements also cannot prove he was treated less favorably than similarly situated employees who were not members of the protected class, under nearly identical circumstances. As set out above, even if Mr. Clements can establish a prima facie case, the Company has established a bona fide, business related, nondiscriminatory basis for its personnel actions and Mr. Clements will not be able to prove these reasons are a "mere pretext" for some discriminatory act.

6.      Conclusion. For the reasons discussed above in this position statement, Mr. Clements was not discriminated against on the basis of his age, disability or sexual orientation at any time during his application process for employment with Zip-Pak. It is understandable that Mr. Clements believes he is the better candidate for positions to which he applies; however, it is the prerogative of management to assess job candidates and make personnel decisions it deems are in the best interest of the company. In this instance, the company hired the best candidate for the position after completing a thorough search. It is well-settled that an applicant's own belief that he was the better candidate is irrelevant; only the perceptions of the decision-maker matter. *Mills v. First Fed. Sav. & Loan Ass'n. of Belvidere*, 83 F.3d 833, 843 (7th Cir.1996); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir.1994). There is simply no proof that the company had any discriminatory motive in selecting another candidate for the open position. "Proof of discriminatory motive is critical." *Teamsters v. United States*, 431 U.S. 324 (1977). A good faith exercise of an employer's business judgment is not a violation of Title VII. *See Grant v. Metro. Gov't of Nashville & Davidson Cty.*, 759 Fed. Appx. 406, 2018 FEP Cases 477781 (6th Cir. 2018) (finding that where the employer determines that the employee did not have the relevant expertise, there is no finding that the denial of a promotion was in retaliation for a protected activity); *see also Evans v. Meadow Steel Products, Inc.*, 35 FEP 1195 (DC Ga. 1984). Title VII does not vest the federal courts with power to sit as review boards for every personnel decision; it does not even require an employer to have good cause for its decisions. *Peden v. Suwannee County School Board*, 64 FEP Cases 295 (MD Fla. 1993). Further, Title VII was not intended to diminish traditional management prerogatives. *Steelworkers v. Weber*, 443 U.S. 193 (1979). Zip-Pak has shown here that Mr. Clements' allegations that he was discriminated against due to sexual orientation, disability and/or age simply have no merit. Zip-Pak has proven its legitimate, non-discriminatory basis for its decision not to interview, in one case, or hire, in another, Mr. Clements. Therefore, this Charge

# ^NORTON ROSE FULBRIGHT

August 30, 2022

**EEOC Portal**

Norton Rose Fulbright US LLP
444 W. Lake Street, Suite 1700
Chicago, Illinois 60606
United States of America

U.S. Equal Employment Opportunity Commission
Chicago District Office
230 S. Dearborn Street
Chicago, IL 60604

Direct line +1 312 964 7735
marykathryn.curry@nortonrosefulbright.com

Tel +1 312 964 7800
Fax +312 964 7799

Re:     EEOC 440-2022-06814
        Eric Clements v. Zip-Pak, an ITW Company

Dear EEOC Officer:

Norton Rose Fulbright US LLP was recently retained to represent Respondent Zip Pack, an ITW Company ("Zip-Pak") in the above referenced EEOC Charge. Zip-Pak has been directed to provide a Position Statement to the EEOC by September 6, 2022. Zip-Pak respectfully requests an extension to October 6, 2022 to provide the Position Statement. This request is being made in good faith due to the upcoming Federal holiday, to allow Zip-Pak time to research and prepare responsive information, along with providing counsel time to become informed on the facts of this matter. Please let us know if the request for extension of time to submit the Position Statement is granted.

Very truly yours,

*Mary Kathryn Curry*

Mary Kathryn Curry

MKC/ASI

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.                                    Clements

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

U.S. Equal Employment Opportunity Commission
October 21, 2022
Page 8

NORTON ROSE FULBRIGHT

should be dismissed. Accordingly, Zip-Pak respectfully requests that a no-cause determination be issued as expeditiously as possible.

Very truly yours,

*Mary Kathryn Curry*

Mary Kathryn Curry

MKC/ASI



# Depression, PTSD, & Other Mental Health Conditions in the Workplace: Your Legal Rights

Issuing Authority

This technical assistance document was issued upon approval of the Chair of the U.S. Equal Employment Opportunity Commission.

**OLC Control Number**

EEOC-NVTA-2016-11

**Concise Display Name**

Depression, PTSD, & Other Mental Health Conditions in the Workplace: Your Legal Rights

**Issue Date**

12-12-2016

**General Topics**

ADA/GINA

**Summary**

This document provides information on the ADA rights of people with depression, PTSD, and other Mental Health Conditions.

**Citation**

ADA, Rehabilitation Act, 29 CFR Part 1630

**Document Applicant**

Employees, Applicants, Employers

**Previous Revision**

No

Disclaimer

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies. If you have depression, post-traumatic stress disorder (PTSD), or another mental health condition, you are protected against **discrimination** and **harassment** at work because of your condition, you have workplace **privacy** rights, and you may have a legal right to get reasonable **accommodations** that can help you perform and keep your job. The following questions and answers briefly explain these rights, which are provided by the Americans with Disabilities Act (ADA). You may also have additional rights under other laws not discussed here, such as the Family and Medical Leave Act (FMLA) and various medical insurance laws.

**1. Is my employer allowed to fire me because I have a mental health condition?**

No. It is illegal for an employer to **discriminate** against you simply because you have a mental health condition. This includes firing you, rejecting you for a job or promotion, or forcing you to take leave.

An employer doesn't have to hire or keep people in jobs they can't perform, or employ people who pose a "direct threat" to safety (a significant risk of substantial harm to self or others). But an employer cannot rely on myths or stereotypes about your mental health condition when deciding whether you can perform a job or whether you pose a safety risk. Before an employer can reject you for a job based on your condition, it must have objective evidence that you can't perform your job duties, or that you would create a significant safety risk, even with a reasonable accommodation (see Question 3).

**2. Am I allowed to keep my condition private?**

In most situations, you can keep your condition private. An employer is only allowed to ask medical questions (including questions about mental health) in four situations:

- When you ask for a reasonable accommodation (see Question 3).

- After it has made you a job offer, but before employment begins, as long as everyone entering the same job category is asked the same questions.

- When it is engaging in affirmative action for people with disabilities (such as an employer tracking the disability status of its applicant pool in order to assess its recruitment and hiring efforts, or a public sector employer considering whether special hiring rules may apply), in which case you may choose whether to respond.

- On the job, when there is objective evidence that you may be unable to do your job or that you may pose a safety risk because of your condition.

You also may need to discuss your condition to establish eligibility for benefits under other laws, such as the FMLA. If you do talk about your condition, the employer cannot discriminate against you (see Question 5), and it must keep the information confidential, even from co-workers. (If you wish to discuss your condition with coworkers, you may choose to do so.)

**3. What if my mental health condition could affect my job performance?**

You may have a legal right to a reasonable accommodation that would help you do your job. A reasonable accommodation is some type of change in the way things are normally done at work. Just a few examples of possible accommodations include altered break and work schedules (e.g., scheduling work around therapy appointments), quiet office space or devices that create a quiet work environment, changes in supervisory methods (e.g., written instructions from a supervisor who

usually does not provide them), <u>specific shift assignments</u>, and <u>permission to work from home</u>.

You can get a reasonable accommodation for any mental health condition that would, if left untreated, "substantially limit" your ability to concentrate, interact with others, communicate, eat, sleep, care for yourself, regulate your thoughts or emotions, or do any other "major life activity." (You don't need to actually stop treatment to get the accommodation.)

**Your condition does not need to be permanent or severe to be "substantially limiting."** It may qualify by, for example, making activities more difficult, uncomfortable, or time-consuming to perform compared to the way that most people perform them. If your symptoms come and go, what matters is how limiting they would be when the symptoms are present. Mental health conditions like major depression, post-traumatic stress disorder (PTSD), bipolar disorder, schizophrenia, and obsessive compulsive disorder (OCD) should <u>easily</u> qualify, and many others will qualify as well.

### 4. How can I get a reasonable accommodation?

Ask for one. Tell a supervisor, HR manager, or other appropriate person that you need a change at work because of a medical condition. You may ask for an accommodation at any time. Because an employer does not have to excuse poor job performance, even if it was caused by a medical condition or the side effects of medication, it is generally better to get a reasonable accommodation **before** any problems occur or become worse. (Many people choose to wait to ask for accommodation until after they receive a job offer, however, because it's very hard to prove illegal discrimination that takes place before a job offer.) You don't need to have a particular accommodation in mind, but you can ask for something specific.

### 5. What will happen after I ask for a reasonable accommodation?

Your employer may ask you to put your request in writing, and to generally describe your condition and how it affects your work. The employer also may ask you to submit a letter from your health care provider documenting that you have a mental health condition, and that you need an accommodation because of it. If you do not want the employer to know your specific diagnosis, it may be enough to provide documentation that describes your condition more generally (by stating, for example, that you have an "anxiety disorder"). Your employer also might ask your health care provider whether particular accommodations would meet your needs. You can help your health care provider understand the law of reasonable accommodation by bringing a copy of the EEOC publication <u>The Mental Health Provider's Role in a Client's Request for a Reasonable Accommodation at Work</u> to your appointment.

If a reasonable accommodation would help you to do your job, your employer must give you one unless the accommodation involves significant difficulty or expense. If

more than one accommodation would work, the employer can choose which one to give you. Your employer can't legally fire you, or refuse to hire or promote you, because you asked for a reasonable accommodation or because you need one. It also cannot charge you for the cost of the accommodation.

### 6. What if there's no way I can do my regular job, even with an accommodation?

If you can't perform all the essential functions of your job to normal standards and have no paid leave available, you still may be entitled to unpaid leave as a reasonable accommodation if that leave will help you get to a point where you can perform those functions. You may also qualify for leave under the Family and Medical Leave Act, which is enforced by the United States Department of Labor. More information about this law can be found at www.dol.gov/whd/fmla.

If you are permanently unable to do your regular job, you may ask your employer to reassign you to a job that you can do as a reasonable accommodation, if one is available. More information on reasonable accommodations in employment, including reassignment, is available here.

### 7. What if I am being harassed because of my condition?

**Harassment** based on a disability is not allowed under the ADA. You should tell your employer about any harassment if you want the employer to stop the problem. Follow your employer's reporting procedures if there are any. If you report the harassment, your employer is legally required to take action to prevent it from occurring in the future.

### 8. What should I do if I think that my rights have been violated?

The Equal Employment Opportunity Commission (EEOC) can help you decide what to do next, and conduct an investigation if you decide to file a charge of discrimination. Because you must file a charge within 180 days of the alleged violation in order to take further legal action (or 300 days if the employer is also covered by a state or local employment discrimination law), it is best to begin the process early. **It is illegal for your employer to retaliate against you for contacting the EEOC or filing a charge.** For more information, visit http://www.eeoc.gov, call 800-669-4000 (voice) or 800-669-6820 (TTY), or visit your local EEOC office (*see* https://www.eeoc.gov/field for contact information).

EXHIBIT #10 THE DEPARTMENT OF LABOR STATE IT IS UNLAWFUL TO DISCRIMINATE WITH RESPECT TO any TERM, CONDITION, OR PRIVILEGE OF EMPLOYMENT INCLUDING BUT NOT LIMITED TO, RECRUITMENT, HIRING, FIRING, PROMOTION, LAYOFF, COMPENSATION, BENEFITS, JOB ASSIGNMENTS, and TRAINING The ADEA (SO WHY CAN ZIP-PAK HIRE and TRAIN 22 YEAR OLD UNEXPERIENCED NOAH BLAKLEY BUT NOT ME A 42 YEAR OLD EXPERIENCED APPLICANT? WHY AM I DENIED EMPLOYMENT and NOT TRAINED LIKE younger APPLICANTS? WHY IS THE EMPLOYER USING ASSUMED LACK OF COMPUTER SKILLS AS REASON TO NOT HIRE ME INSTEAD OF OFFERING TRAINING, EVEN THOUGH I DO HAVE COMPUTER SKILLS.


EXHIBIT #11 DEPARTMENT OF LABOR CONFIRMS HARASSMENT OUTSIDE OFF SITE OFF DUTY IS PROHIBITTED and I GOT SCREENSHOT EVIDANCE OF ZIP-PAK EMPLOYEE NOAH BLAKLEY SEXUALLY HARASSING ME OUTSIDE OF WORK OFF SITE WHILE OFF DUTY, WHICH CAUSED ME TO ATTEMPT SUICIDE and RESULTED IN ME BECOMING A VICTIM OF HATE CRIME, THIS WAS SUBMITTED IN MY EEOC PUBLIC PORTAL COMPLAINT

Case: 1:23-cv-01066 Document #: 1 Filed: 02/22/23 Page 55 of 85 PageID #:55



(31)

EXHIBIT#10

3:20 M ● ● ○ ●                                    LTE ▂▃▄

✕    🔒  What do I need to know ...        ⤴    🔖    ⋮
          dol.gov



*Image Courtesy of www.theladders.com*

**The Age Discrimination in Employment Act of 1967 (ADEA) protects individuals who are 40 years of age or older from employment discrimination based on age.**

Under the ADEA it is ***unlawful*** to discriminate against any individual age 40 or older because of his/her age with respect to any term, condition, or privilege of employment, including but not limited to, recruitment, hiring, firing, promotion, layoff, compensation, benefits, job assignments, and training The ADEA permits federal agencies to favor older workers based on age, even when doing so adversely affects a younger worker who is 40 years of age or older.

Important ADEA principles include:

|||    ○    <



12:19   ▣ M ◎ •     ✕ LTE ⏢

✕    **U.S. Department of Labor Policy Statement on Har...**   •••
      🔒 dol.gov

witnesses participating in this process—should feel assured that the Department will act with sensitivity and uphold confidentiality to the greatest extent possible.

The Department is committed to taking prompt and effective action against harassing conduct if the Department is appropriately notified of this behavior. The Department prohibits harassing conduct at every level in the organization, including when the conduct is committed by administrators, supervisors, managers, co-workers,

Copy    Share    Select all    Web search

are not the intended target. The Department prohibits harassing conduct in a variety of contexts, including off-site or off-duty, during official travel or at a work event, or even using social media.

Employees or contract employees engaged in DOL workspaces who believe that they have been directly or indirectly subjected to or have witnessed any harassing conduct should promptly report the matter to a person in their supervisory chain and/or to their agency Workplace Equality Compliance Office (WECO) ...

|||      ○      ‹



January 15, 2019 Employment Practices Liability

# Lack of Training Deemed Adverse Action

Posted by Christopher P. MaugansSeth L. Laver

What is an "adverse action"? In the workplace some may think that it is only when someone is fired. However, much more falls under the "adverse action" umbrella. What about denying an employee a training opportunity? A federal district court in New York recently analyzed this very issue. The case involved a longstanding employee that was placed into a different role but denied training opportunities that were offered to other employees. The plaintiff struggled in her new role and eventually commenced a lawsuit asserting many claims, including race discrimination.

Case: 1:23-cv-01066 Document #: 1 Filed: 02/22/23 Page 58 of 85 PageID #:58

# Civil Rights Violations

General Provisions:

- Under the Illinois Human Rights Act, it is a civil rights violation for employer to refuse to hire, to segregate, to engage in harassm or to act with respect to recruitment, hiring, promotion, renev employment, selection for training or apprenticeship, disch discipline, tenure or terms, privileges or conditions of employme the basis of unlawful discrimination or citizenship status." (77⁵ 5/2-102(A)).



U.S. Equal Employment Opportunity Commission

Search by Keywords (optional)

Search. Search

- About EEOC

## Breadcrumb

1. Home

2. Prohibited Employment Policies/Practices

## PrintEmailShare

# Prohibited Employment Policies/Practices

Under the laws enforced by EEOC, it is illegal to discriminate against someone (applicant or employee) because of that person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. It is also illegal to retaliate against a person because he or she complained about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.

The law forbids discrimination in every aspect of employment.

The laws enforced by EEOC prohibit an employer or other covered entity from using neutral employment policies and practices that have a disproportionately negative effect on applicants or employees of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), or national origin, or on an individual with a disability or class of individuals with disabilities, if the polices or practices at issue are not job-related and necessary to the operation of the business. The laws enforced by EEOC also prohibit an employer from using neutral employment policies and practices that have a disproportionately negative impact on applicants or employees age 40 or older, if the policies or practices at issue are not based on a reasonable factor other than age.

## Job Advertisements

It is illegal for an employer to publish a job advertisement that shows a preference for or discourages someone from applying for a job because of his or her race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

For example, a help-wanted ad that seeks "females" or "recent college graduates" may discourage men and people over 40 from applying and may violate the law.

## Recruitment

It is also illegal for an employer to recruit new employees in a way that discriminates against them because of their race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

For example, an employer's reliance on word-of-mouth recruitment by its mostly Hispanic work force may violate the law if the result is that almost all new hires are Hispanic.

## Application & Hiring

It is illegal for an employer to discriminate against a job applicant because of his or her race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not refuse to give employment applications to people of a certain race.

An employer may not base hiring decisions on stereotypes and assumptions about a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

If an employer requires job applicants to take a test, the test must be necessary and related to the job and the employer may not exclude people of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, or individuals with disabilities. In addition, the employer may not use a test that excludes applicants age 40 or older if the test is not based on a reasonable factor other than age.

If a job applicant with a disability needs an accommodation (such as a sign language interpreter) to apply for a job, the employer is required to provide the accommodation, so long as the accommodation does not cause the employer significant difficulty or expense.

## Background Checks

See "Pre-Employment Inquiries" below.

## Job Referrals

It is illegal for an employer, employment agency or union to take into account a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information when making decisions about job referrals.

## Job Assignments & Promotions

It is illegal for an employer to make decisions about job assignments and promotions based on an employee's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not give preference to employees of a certain race when making shift assignments and may not segregate employees of a particular national origin from other employees or from customers.

An employer may not base assignment and promotion decisions on stereotypes and assumptions about a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

If an employer requires employees to take a test before making decisions about assignments or promotions, the test may not exclude people of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), or national origin, or individuals with disabilities, unless the employer can show that the test is necessary and related to the job. In addition, the employer may not use a test that excludes employees age 40 or older if the test is not based on a reasonable factor other than age.

## Pay And Benefits

It is illegal for an employer to discriminate against an employee in the payment of wages or employee benefits on the bases of race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. Employee benefits include sick and vacation leave, insurance, access to overtime as well as overtime pay, and retirement programs. For example, an employer many not pay Hispanic workers less than African-American workers because of their national origin, and men and women in the same workplace must be given equal pay for equal work.

In some situations, an employer may be allowed to reduce some employee benefits for older workers, but only if the cost of providing the reduced benefits is the same as the cost of providing benefits to younger workers.

# Discipline & Discharge

An employer may not take into account a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information when making decisions about discipline or discharge. For example, if two employees commit a similar offense, an employer many not discipline them differently because of their race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

When deciding which employees will be laid off, an employer may not choose the oldest workers because of their age.

Employers also may not discriminate when deciding which workers to recall after a layoff.

# Employment References

It is illegal for an employer to give a negative or false employment reference (or refuse to give a reference) because of a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

# Reasonable Accommodation & Disability

The law requires that an employer provide reasonable accommodation to an employee or job applicant with a disability, unless doing so would cause significant difficulty or expense for the employer.

A reasonable accommodation is any change in the workplace (or in the ways things are usually done) to help a person with a disability apply for a job, perform the duties of a job, or enjoy the benefits and privileges of employment.

Reasonable accommodation might include, for example, providing a ramp for a wheelchair user or providing a reader or interpreter for a blind or deaf employee or applicant.

# Reasonable Accommodation & Religion

The law requires an employer to reasonably accommodate an employee's religious beliefs or practices, unless doing so would cause difficulty or expense for the employer. This means an employer may have to make reasonable adjustments at work that will allow the employee to practice his or her religion, such as allowing an employee to voluntarily swap shifts with a co- worker so that he or she can attend religious services.

## Training & Apprenticeship Programs

It is illegal for a training or apprenticeship program to discriminate on the bases of race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not deny training opportunities to African-American employees because of their race.

In some situations, an employer may be allowed to set age limits for participation in an apprenticeship program.

## Harassment

It is illegal to harass an employee because of race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

It is also illegal to harass someone because they have complained about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.

Harassment can take the form of slurs, graffiti, offensive or derogatory comments, or other verbal or physical conduct. Sexual harassment (including unwelcome sexual advances, requests for sexual favors, and other conduct of a sexual nature) is also unlawful. Although the law does not prohibit simple teasing, offhand comments, or isolated incidents that are not very serious, harassment is illegal if it is so frequent or severe that it creates a hostile or offensive work environment or if it results in an adverse employment decision (such as the victim being fired or demoted).

The harasser can be the victim's supervisor, a supervisor in another area, a co-worker, or someone who is not an employee of the employer, such as a client or customer.

Harassment outside of the workplace may also be illegal if there is a link with the workplace. For example, if a supervisor harasses an employee while driving the employee to a meeting.

*Read more about harassment.*

## Terms & Conditions Of Employment

The law makes it illegal for an employer to make any employment decision because of a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. That means an employer may not discriminate when it comes to such things as hiring, firing, promotions, and pay. It also means an employer may not discriminate, for example,

when granting breaks, approving leave, assigning work stations, or setting any other term or condition of employment - however small.

# Pre-Employment Inquiries (General)

As a general rule, the information obtained and requested through the pre-employment process should be limited to those essential for determining if a person is qualified for the job; whereas, information regarding race, sex, national origin, age, and religion are irrelevant in such determinations.

Employers are explicitly prohibited from making pre-offer inquiries about disability.

Although state and federal equal opportunity laws do not clearly forbid employers from making pre-employment inquiries that relate to, or disproportionately screen out members based on race, color, sex, national origin, religion, or age, such inquiries may be used as evidence of an employer's intent to discriminate unless the questions asked can be justified by some business purpose.

Therefore, inquiries about organizations, clubs, societies, and lodges of which an applicant may be a member or any other questions, which may indicate the applicant's race, sex, national origin, disability status, age, religion, color or ancestry if answered, should generally be avoided.

Similarly, employers should not ask for a photograph of an applicant. If needed for identification purposes, a photograph may be obtained after an offer of employment is made and accepted.

# Pre-Employment Inquiries and:

- Race
- Height & Weight
- Financial Information
- Unemployed Status
- Background Checks
- Religious Affiliation Or Beliefs
- Citizenship
- Marital Status, Number Of Children
- Gender
- Disability

- Medical Questions & Examinations

# Dress Code

In general, an employer may establish a dress code which applies to all employees or employees within certain job categories. However, there are a few possible exceptions.

While an employer may require all workers to follow a uniform dress code even if the dress code conflicts with some workers' ethnic beliefs or practices, a dress code must not treat some employees less favorably because of their national origin. For example, a dress code that prohibits certain kinds of ethnic dress, such as traditional African or East Indian attire, but otherwise permits casual dress would treat some employees less favorably because of their national origin.

Moreover, if the dress code conflicts with an employee's religious practices and the employee requests an accommodation, the employer must modify the dress code or permit an exception to the dress code unless doing so would result in undue hardship.

Similarly, if an employee requests an accommodation to the dress code because of his disability, the employer must modify the dress code or permit an exception to the dress code, unless doing so would result in undue hardship.

# Constructive Discharge/Forced To Resign

Discriminatory practices under the laws EEOC enforces also include constructive discharge or forcing an employee to resign by making the work environment so intolerable a reasonable person would not be able to stay.

# On This Page

- Job Advertisements
- Recruitment
- Application & Hiring
- Background Checks
- Job Referrals
- Job Assignments & Promotions
- Pay And Benefits
- Discipline & Discharge
- Employment References

- Reasonable Accommodation & Disability
- Reasonable Accommodation & Religion
- Training & Apprenticeship Programs
- Harassment
- Terms & Conditions Of Employment
- Pre-Employment Inquiries
- Dress Code
- Constructive Discharge/Forced To Resign

# U.S. Equal Employment Opportunity Commission

**EEOC Headquarters**

131 M Street, NE
Washington, DC 20507
1-800-669-6820 (TTY)
1-844-234-5122 (ASL Video Phone)

**Questions?**

Call 1-800-669-4000
For Deaf/Hard of Hearing callers:
1-800-669-6820 (TTY)
1-844-234-5122 (ASL Video Phone)
info@eeoc.gov

Find your nearest EEOC office
Frequently Asked Questions

**Connect With Us**

- FOIA
- Privacy Policy
- Disclaimer
- Accessibility
- Office of Inspector General
- USA.gov

EXHIBIT #12 PROVES sexual HaRassment TO Be UNLAWFUL, EXHIBIT #12 PROves sexual HaRassment outside oF WORK STILL considered THe employers ResPonSIBILITY, EXHIBIT #12 confiRms THaT spReading FaLSe RumoRS may create a hostiLe enviRonment.

EXHIBIT #13 and EXHIBIT #4 BOTH confiRm THat haRassment claims got made By BoTH employee NOAH BLaKLey and me I SUBMITTed evidance and my witness neveR goT questioned and my evidance was ignoRed and my sex HaRassmeNT cLAim neveR goT investigaTed insTead THe employer JUST BeLieved THe FaLse accusations made By employee NOAH BLaKLey aBout me accusing me oF a cRime/sex, Leading To me noT Being HiRed, and THe employeR KeePing NOAH BLaKLey emPLoyed

EXHIBIT #13

**August 25, 2021**

By: Kathlyn Graves, Nathan A. Read, Cara D. Butler
Category: Employment
Download PDF
In the wake of the #MeToo Movement and as again recently seen in media headlines, sexual harassment continues to be a prevalent problem in today's culture, and no employer is immune from the duty to prevent and resolve harassment claims in the workplace. These claims include not only sexual harassment, but harassment based on race, national origin, age, disability, and any other status protected by law.[1]  However, with this duty comes an opportunity for employers to create open communication about sexual harassment and clearly define the boundaries of acceptable workplace conduct. The purpose of this article is to provide guidance on how to recognize and investigate a claim of workplace harassment.

**Duty to Investigate.** Once a harassment complaint arises, an employer has the affirmative duty to investigate. This duty arises whether the complaint is made formally pursuant to an established grievance procedure or harassment policy or made in some informal manner. The employer's duty to investigate a complaint of harassment was highlighted in two Supreme Court decisions. In *Burlington Industries. Inc. v. Ellerth*,[2] the court stated that the "[e]mployer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it". In *Faragher v. City of Boca Raton*,[3] the court added that an employer can avoid or minimize liability for

actionable harassment by investigating and taking prompt remedial action to end the harassment.

Under *Ellerth* and *Faragher*, an employer is absolutely liable for any harassment which results in a "tangible employment action" (defined to include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") regardless of its policies or remedial efforts.[4] When there is no tangible employment action, the employer becomes vicariously liable for the actions of its supervisors, but can prevail on an affirmative defense by showing (a) "that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (b) that the plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise."[5]

An employer may lose the opportunity to prevail on these affirmative defenses by failing to investigate. A fact finder may find that the employer failed to "exercise reasonable care to prevent and correct [harassment] promptly" if the employer fails to investigate. Further, when an employer is known to be reluctant to investigate, it has more difficulty showing that the complainant unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm. For example, the U.S. Court of Appeals for the Eighth Circuit, applying *Ellerth*, upheld a jury verdict on a sexual harassment claim, where the employer minimized the employee's complaint, performed a cursory investigation, and failed to discipline the harasser. [6]

Every employer should have a written internal complaint procedure such as a harassment policy which contains a complaint procedure designed to encourage victims of harassment to come forward. Obviously, complaints made pursuant to the complaint procedure must be investigated. However, informal reports of harassment or indications from an aggrieved or third person that inappropriate conduct is occurring must be investigated, even if the term "harassment" is not used. Further, an employer may be held to have had "constructive knowledge' of the harassment if it is so pervasive that an employer "should have known of it." [7] Thus, an employer's obligation to investigate is triggered by a supervisor's observations of inappropriate comments or conduct, general office knowledge of harassing behavior, and requests that inappropriate conduct cease.

In most cases the employer has a duty to investigate instances of harassment even where the alleged victim does not request or consent to the investigation. At a minimum, an employer should continue to monitor the situation by checking with the victim of the alleged harassment to determine whether or not the conduct has ceased and whether the victim still stands by the request not to take action.

The employer's investigation should commence and conclude promptly. In some circumstances it may be necessary to take interim measures before the conclusion of the investigation. This might include a temporary transfer of the alleged harasser or placing the alleged harasser on leave of absence pending

conclusion of the investigation. Care should be taken not to disadvantage the victim of the alleged harassment in order to avoid the perception of retaliation. Delay in commencing an investigation can be considered as indifference on the employer's part to a hostile working environment. Further, as time passes, memories fade and evidence may disappear. More importantly, the opportunity to put a prompt end to inappropriate conduct is lost. As a result the complainant is less likely to be satisfied with the employer's responses to his or her complaints.

**Conducting the Investigation.** The aim of every investigation is to determine certain basic facts: what happened, who the alleged harasser(s) were, where and when the incident took place, how the complainant's work was affected, whether anyone else witnessed the incident, whether the incident was isolated or part of a continuing practice, what the reaction of the complainant was, how the complainant has been affected, whether the complainant has talked to anyone else about the incident and whether there is any documentation of the incident. The adequacy of an investigation will be judged on the facts and circumstances of each situation.

Normally, harassment policies advise the complainant to either contact a supervisor or a designated official in the Human Resources Department. It is critical that supervisors and managers have instructions with respect to reporting to the Human Resources Department any complaints they receive so that a decision can be made about the appropriate person to investigate the complaint. Having the wrong person investigate

can discourage harassment victims from reporting meritorious claims and cause the employer to make decisions based on faulty or incomplete information. Ideally, the investigator should be a person who has the respect of employees and who has an understanding of the issues under investigation. Perhaps most importantly, the investigator must be willing and able to devote the time necessary to the investigation. The investigator must not appear to advocate for either the complainant or the alleged harasser. If objectivity may be difficult for those within the business, it may be a good idea to bring in an outside investigator to protect the fairness and impartiality of the investigation.

**Interview with the Complainant.** During the initial interview with the complainant, the interviewer should prepare a list of open-ended questions to establish as to each alleged incident of harassment:

1. When and where the incident occurred;
2. What was said or done by both parties;
3. Whether there were any witnesses;
4. The effects of the incident;
5. Whether there are any documents containing information about the alleged incident; and
6. Whether the complainant has knowledge of any other person who has been similarly harassed.

Under normal circumstances the complainant should be asked to put this information in writing or should be requested to sign the interview prepared by the interviewer. This is necessary in order to make sure that the proper information is being

investigated and that the complainant stands by the allegations down the line.

The complainant should be assured at the outset that he or she will be protected from any unlawful retaliation and that during the course of the investigation the employer will limit the disclosure of the information to those with a need to know. However, the complainant must understand that it will be necessary to discuss the information with the alleged harasser(s) and others. Only in rare circumstances will it be possible to investigate the charge of harassment without identifying the complainant to the alleged harasser. However, it may be possible to avoid disclosure to third party potential witnesses. If the complainant is reluctant to divulge names and details or sign a statement, the adequacy of the investigation will obviously be limited, as the employer can only go forward on the basis of what the complainant provides.

**Interview with the Alleged Harasser.** Whether the alleged harasser is interviewed prior to other witnesses will be dependent on the factual circumstances. In some instances it may be helpful to interview other witnesses prior to talking to the alleged harasser.
The alleged harasser should be informed of the purpose of the investigation, assured that no conclusion has been made regarding the investigation, and told that the investigation will be conducted as confidentially as possible. The alleged harasser should be told the allegations of harassment in enough detail to allow him or her to respond fully to the claim(s). Further, the

alleged harasser should be made aware that he or she must avoid any appearance of reprisal against the complainant and that any reprisal could serve as an independent basis for discipline. If the alleged harasser believes there is a motive for the complainant making the claim(s) to lie, then facts supporting that belief should be explored as should any claim that the harassment was not unwelcome.

**Additional Interviews.** All persons with knowledge of the facts including those identified by the complainant and the alleged harasser should be investigated. In many cases it may be necessary to re- interview the complainant after talking to witnesses and particularly after talking to the alleged harasser. In serious cases, signed written statements should also be obtained from the significant witnesses. In addition, the alleged harasser should be provided with an opportunity to respond to adverse statements made by witnesses.

**Additional Evidence.** Beyond interviews, it is also important to gather any information that may corroborate or negate the complaint. For example, this could include e-mails, text messages, social media posts, etc. In addition, some employers may have key card access or security camera systems that could also provide evidence. Finally, it may also be helpful to review past performance evaluations or complaints to determine whether there is any pattern of behavior.

**Concluding the Investigation.** In reaching a conclusion of the investigation, the investigator should evaluate whether the facts given are based on first-hand knowledge, hearsay, rumors or gossip and should assess the parties motivations to lie or

embellish. It may be helpful to draft a written report that documents the investigation and conclusions.
Documenting the investigation will enhance the credibility of the investigation, particularly if it is documented as it progresses with signed statements from the witnesses interviewed. Employers should remember that a written record will be discoverable when litigation follows. Having written statements will be of great value should a disciplined harasser later challenge the action and will give a basis for establishing that the employer in fact had an appropriate basis for taking such a disciplinary action. Likewise, if no action is taken as a result of the investigation, the various statements should be helpful in supporting that there was insufficient evidence to support discipline.

The sexual harassment investigative file should not be kept in the personnel file. However, if there is discipline imposed, a copy of the discipline should be placed in the alleged harasser's file. A copy of the investigative report can be kept in corporate counsel's office or filed separately by the human resources manager.

**Taking Prompt Remedial Action.** When the investigation has been completed, a conclusion should be reached and some specific action should occur. First and foremost, the results of the investigation should be communicated promptly to the complainant as well as the alleged harasser. The employer should always be mindful of potential liability for defamation when specific harassment allegations are disseminated and

such information should never be disseminated beyond those persons with a direct need to know.

There may be many situations in which it cannot be determined whether sexual harassment has occurred or not because there is no information available except for the complainant's accusations and the harasser's denial. In this type of case the complainant should be assured that although no finding could be made, the employer intends to enforce its sexual harassment policy and protect employees from harassment as well as from retaliation for participating in any investigation and that any future harassment should be reported promptly. It is very important in these situations to check back with the complainant on a periodic basis to make sure that no retaliation occurs and that no other instances of harassment have occurred. The alleged harasser should be advised that although no determination could be made as to the truth of the claim, all employees are expected to comply with the company's policy against harassment and retaliation. Further, the employer should remind the alleged harasser that retaliation will not be tolerated.

The employer should also consider a transfer or reassignment of work to prevent future contact between the complainant and the alleged harasser. This is a touchy subject and can best be handled by offering both the complainant and the alleged harasser an opportunity to make a voluntary move. Employers should be careful, however, about involuntarily moving a complainant when that move would result in less favorable terms and conditions of employment. Remedial measures

should not adversely affect the complainant. Thus, for example, if it is necessary to separate the parties, then the harasser should be transferred (unless the complainant prefers otherwise). Remedial responses that penalize the complainant could constitute unlawful retaliation and are not effective in correcting the harassment.

If at the conclusion of the investigation it is determined that harassment has occurred, the employer must take "prompt remedial action". This will include some type of disciplinary action against the alleged harasser and advising the complainant of the action taken. Remedial action is generally considered to be adequate if it is "reasonably calculated to prevent further harassment." It is not sufficient to simply end the current harassment. It is also necessary to discipline the harasser.

The remedial action taken need not be the most severe sanction available. Most courts are satisfied as long as the action is reasonably calculated to prevent further harassment. Discipline may range from an oral warning to termination of employment. Several factors to be considered in determining the appropriate discipline are: the severity of the conduct; discipline imposed for previous cases of sexual harassment; discipline imposed for violations of other company policies; and the harasser's disciplinary and employment history.

Generally, a written reprimand is preferable since it creates a record of the employer's action and can be seen as a more concrete evidence of the employers desire to deter the conduct.

For incidents of sexual harassment that warrant stronger discipline than a mere warning, short of discharge, a suspension or demotion may be an appropriate remedy. Particularly, demoting a supervisor from a supervisory position to an hourly position may be appropriate. Denying a salary increase, bonus or otherwise imposing a monetary penalty may also serve as appropriate disciplinary measures.

The employer is, of course, obliged to respond to any repeat conduct; and whether the employer's next response is reasonable may very well depend on whether the employer progressively stiffens its discipline or vainly hopes that no response, or the same responses as before, will be effective. Repeat conduct may show the unreasonableness of prior responses. On the other hand, an employer is not liable, although a perpetrator persists, so long as each response was reasonable. An employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to end the harassment.

An internal investigation should protect the reputation of both complainant and the alleged harasser. The allegations and information obtained should be discussed only with the involved parties; each person interviewed should be admonished not to discuss the matter with others; and should be informed of the risk of defamation if the incident is discussed outside the investigation. However, emphasizing the need for confidentiality should not result in intimidating the complainant or the supporting witnesses. A qualified privilege usually protects

company investigators and witnesses who make defamatory statements in good faith and for a proper purpose to one who has a legitimate interest in or duty to receive the information. However, statements not made for good cause but made maliciously or recklessly abuse the privilege and will result in the loss of the privilege.

In the wake of the recent media coverage of sexual harassment, an employer must realize that it cannot stick its head in the sand with respect to harassment complaints. Employers should strive to ensure that employees understand its policies and procedures, as well as its commitment to preventing and correcting inappropriate conduct in the workplace.

**About the Authors:** Attorneys Kathy Graves, Nathan Read, and Cara Butler are employment attorneys with extensive experience representing businesses and organizations in all matters of employment law with a focus on employment counseling and employment litigation. They can be reached at kgraves@mwlaw.com nread@mwlaw.com or cbutler@mwlaw.com

[1] Title VII of the Civil Rights Act of 1964, as amended (race, color, religion, sex, and national origin discrimination); (2) the Americans with Disabilities Act, as amended (disability discrimination) (4) the Age Discrimination in Employment Act (age discrimination).

[2] 118 S.Ct. 2257, 2267 (1998).

[3] 118 S.Ct. 2275 (1998).

[4] *Ellerth,* 118 S.Ct. at 2268.

[5] *Id.* at 2270.

[6] *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000).

[7] *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009).

⑨

EXHIBIT #12

# Spreading False Rumors May Create Hostile Work Environment

**Shawe Rosenthal LLP**

MEMBER FIRM OF **worklaw®** network.

# SHAWE
# ROSENTHAL LLP

MANAGEMENT'S WORKPLACE LAWYERS®



**USA** February 28 2019

The U.S. Court of Appeals for the Fourth Circuit found that spreading a false rumor that a female employee slept with the boss in order to get promoted could create a sexually hostile work environment in violation of Title VII.

In *Parker v. Reema Consulting Servs., Inc.,* a female employee was promoted rapidly to an assistant warehouse manager position. A jealous co-worker started a false rumor that she slept with a higher-ranking manager to get the job, and the rumor was spread by the warehouse manager and others. Although the employee complained to human resources and her supervisor, nothing was done to address the issue. She was subsequently terminated, allegedly for insubordination and because of a complaint against her by the jealous co-worker.

The Fourth Circuit held that the rumors were sex-based in nature, and subject to a "deeply rooted perception – one that unfortunately still persists – that generally women, not men, use sex to achieve success." The Fourth Circuit considered the claim to be based on sex stereotyping. It found the harassment to be severe and pervasive, as the employee alleged that it was frequent, humiliating, malicious, and permeated the workplace which caused "open resentment and disrespect."

While gossip and rumors are typically part of any workplace, this case instructs employers to be particularly sensitive to rumors that implicate a protected characteristic and that can undermine working relationships in the workplace. It is important to address such rumors directly and decisively in order to avoid potential liability in the future.

**Shawe Rosenthal LLP** - Fiona W. Ong

Case: 1:23-cv-01066 Document #: 1 Filed: 02/22/23 Page 83 of 85 PageID #:83

8:18 M    LTE .ill



# Outside of Work



Copy    Share    Select all    Web search

==It may not be widely known, but employers are as responsible for sexual harassment outside of work as they are for harassment that occurs during work hours—when that harassment involves other employees, vendors, customers, or clients. As SHRM's sample Sexual Harassment Out Of Work Policy and Complaint/Investigation Procedure states, "Employees are prohibited from harassing others both on and off the employer premises and during or outside of work hours."==

What might this entail? A manager becoming overly friendly and physically groping an

2/9/23, 11:40 AM
Screenshot_20224043-262341_Chrome~2.jpg

(24)

EXHIBIT #12

8:23 📷 M ☎ •
LTE .ill 🔋

~~Harassment Outside of Work~~

In the New Hampshire case of *McGuinn-Rowe v. Foster's Daily Democrat,* a female employee accused a management-level employee of making inappropriate contact with her at a bar. The employer argued that because the conduct "occurred away from the workplace and outside normal working hours," it wasn't liable. The Court, however, still applied sexual harassment laws outside of work since they were coworkers. With social media being so prevalent, it's also important to note that social media channels can be an easy initiator for har

Copy    Share    Select all    Web search

# Employee Harassment Outside the Workplace Can Create a Hostile Work Environment

Why is employee sexual harassment outside of work still considered the employer's responsibility? Such behavior still serves to create a hostile work environment when the employee is back on the clock. A supervisor who made inappropriate physical contact with an employee at the Friday night happy hour event

G    Employee Harassment Outside the Workplace...

|||         ◯         ‹

(21)

EXHIBIT #12

12:21   •    LTE .ill

✕   **Sexual Harassment | U.S. Equal Employment Oppo...**  •••
🔒 eeoc.gov

🇺🇸 An official website of the United States government
Here's how you know ⌄

 **U.S. Equal Employment Opportunity Commission**

🔍    **MENU**

Home »   Sexual Harassment

 

# Sexual Harassment

It is unlawful to harass a person (an applicant or employee) because of that person's sex. Harassment can include "sexual harassment" or unwelcome sexual advances, requests for sexual favors, and other verbal or physical harassment of a sexual nature.

Harassment does not have to be of a sexual nature, however, and can include offensive remarks about a person's sex. For example, it is illegal to harass a woman by making offensive comments about women in general.

Both victim and the harasser can be either a woman or a man, and the victim and harasser can be the same sex.

 **U.S. Equal Employment...** ✓
35,793 Page likes

ⓘ   ↪   🔖

|||       ◯       ‹